# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRAIRIE CAPITAL III, L.P., a Delaware limited partnership, on behalf of SELLERS OF DOUBLE E PARENT, LLC, <br><br>     Plaintiff, <br><br>     v. <br><br> DOUBLE E HOLDING CORP., a Delaware corporation, <br><br>     Defendant. <br> _____ <br><br> DOUBLE E HOLDING CORP., a Delaware corporation, and INCLINE EQUITY PARTNERS III, L.P., a Delaware limited partnership, <br><br>     Cross-Complaint Plaintiffs, <br><br>     v. <br><br> DANIELS & KING CAPITAL III, LLC, a Delaware limited liability company, PRAIRIE CAPITAL III, L.P., a Delaware limited partnership, PRAIRIE CAPITAL III QP, L.P, a Delaware limited partnership, MARK B. FORTIN, an individual and JEFFREY VANCURA, an individual, <br><br>     Cross-Complaint Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    C.A. No. 10127-VCL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION

Date Submitted: September 1, 2015
Date Decided: November 24, 2015

David S. Eagle, Sean M. Brennecke, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Bonita Stone (argued), James Hutchison, Evan B. Elsner, KATTEN MUCHIN ROSENMAN LLP, Chicago, Illinois; *Counsel for the Plaintiff Prairie Capital III, L.P., and Cross-Complaint Defendants Prairie Capital III QP, L.P., and Daniels & King Capital III, LLC.*

Kenneth J. Nachbar, Christopher P. Quinn, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; Morgan J. Hanson (argued), Fridrikh V. Shrayber, COHEN & GRIGSBY, P.C., Pittsburgh, Pennsylvania; *Counsel for Defendant Double E Holding Corp. and Cross-Complaint Plaintiff Incline Equity Partners III, L.P.*

Francis G.X. Pileggi, Aimee M. Czachorowski, ECKERT SEAMANS CHERIN & MELLOT, LLC, Wilmington, Delaware; Matthew Baltay (argued), Kevin J. Conroy, FOLEY HOAG LLP, Boston, Massachusetts; *Counsel for Cross-Complaint Defendants Mark B. Fortin and Jeffrey Vancura.*

**LASTER, Vice Chancellor.**

This case arises out of the sale of a portfolio company by one private equity firm to another. The portfolio company was Double E Parent LLC ("Double E" or the "Company"). The principal sellers were Prairie Capital, III, L.P. and Prairie Capital III QP, L.P. (the "Prairie Funds"), which were private equity funds sponsored by Prairie Capital Partners ("Prairie Capital"). The purchaser was Double E Holding Corp. (the "Buyer"), which was an acquisition vehicle formed by Incline Equity Partners, III, L.P. (the "Incline Fund"). The Incline Fund was a private equity fund sponsored by Incline Equity Partners ("Incline"). The transaction was governed by a Stock Purchase Agreement dated April 4, 2013 (the "SPA"). The parties signed the SPA and closed on the same date.

Prairie Capital III served as the Sellers' Representative under the SPA. This action began when the Sellers' Representative sued the Buyer to compel the release of funds from escrow. The Incline Fund intervened, and the Buyer and the Incline Fund asserted counterclaims and cross-claims for fraud, aiding and abetting fraud, and conspiracy to commit fraud against the Prairie Funds, the managing member of the Prairie Funds, and two members of Company management. The Buyer and the Incline Fund also asserted two claims for indemnification under the SPA against the Sellers' Representative.

The counterclaim defendants moved to dismiss the claims for fraud, aiding and abetting fraud, and conspiracy to commit fraud. They also moved to dismiss one of the two counts seeking indemnification. The motion to dismiss is granted to the extent that the Buyer and the Incline Fund grounded their fraud-related claims on (i) misrepresentations or omissions outside of the SPA, (ii) the representation in Section

1

3.6(a) of the SPA regarding the Company's Audited Financial Statements (a defined term), and (iii) the representation in Section 3.12 of the SPA regarding compliance with applicable law. The motion to dismiss also is granted as to one aspect of the challenged indemnification claim. Otherwise the motion to dismiss is denied.

## I.      FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the amended counterclaims and cross-claims dated January 26, 2015 and the documents they incorporated by reference. Dkt. 59 (the "Counterclaim" or "CC"). In ruling on the motion to dismiss, the well-pled allegations of the Counterclaim are assumed to be true, and the counterclaim plaintiffs receive the benefit of all reasonable inferences.

### A.      The Company

The Company was a Delaware LLC headquartered in West Bridgewater, Massachusetts. Through subsidiaries, the Company designed, manufactured, and distributed engineered solutions and accessory products used in web process manufacturing. The Company's products included chucks, shafts, rollers, slitting systems, core cutters, brakes, unwind and rewind stands, web guides, and tension control systems.

Before the sale, the Company had issued six classes of member units: Class A Preferred Units, Class A Common Units, Class B Preferred Units, Class B Common Units, Class C Units, and Class D Units. The Prairie Funds and their affiliate, Seacoast Holdings (Double E), Inc., controlled the Company through their ownership of the majority of the Class A Preferred Units and the Class A Common Units. Daniels & King Capital III, LLC (the "Prairie Fund Manager") was the managing member of the Prairie

2

Funds. Other non-party investors held various combinations of the other classes of the Company's member units.

Before the sale, the Company's board of directors had five members. Two were affiliated with and appointed by Prairie Capital: Christopher Killackey, a partner at Prairie Capital, and Sean McNally, a partner and managing director at Prairie Capital (jointly, the "Prairie Capital Directors"). Killackey also served as the President and Secretary of the Company and its subsidiaries. A third member of the board was counterclaim defendant Mark B. Fortin, who served as the Chief Executive Officer of the Company. The Counterclaim does not identify the fourth and fifth directors. Counterclaim defendant Jeffrey Vancura served as the Chief Financial Officer of the Company. He was not a member of the board.

## B.     Prairie Capital Decides To Sell The Company.

In summer 2011, Prairie Capital decided to sell the Company. Prairie Capital and the Company retained Livingstone Partners LLC ("Livingstone") to serve as their joint financial advisor. A working group oversaw the sale process. The working group included:

- Three members of Company management: Fortin, Vancura, and non-party Mark F. Peretti, the Company's Chief Operating Officer.

- The two Prairie Capital Directors: Killackey and McNally.

- Four representatives from Livingstone.

- A lawyer from Katten Muchin Rosenman LLP, Prairie Capital's outside legal counsel.

3

Given their positions as senior executives and members of the working group, Fortin and Vancura played significant roles in the sale process. So did Killackey and McNally, who were directors, members of the working group, and representatives of the private equity firm that controlled the Company.

## C.    Livingstone Contacts Incline.

Prairie Capital originally hoped to sell the Company by year-end 2011. As a first step, the working group prepared a Confidential Information Memorandum ("CIM"), which was finalized in September 2011. Livingstone distributed the CIM to potential acquirers, including Incline. In October 2011, Incline expressed interest in potentially acquiring the Company. Over the next several months, Incline met with, engaged in discussions with, and received presentations from Livingstone and Company management.

Livingstone and Company management pitched the Company as a growth story. They described Prairie Capital's substantial investment in the Company and the resulting improvements in its operations, which had produced steady increases in revenue, earnings, and operating capital during 2010 and 2011. Livingstone and Company management asserted that the trend was likely to continue in 2012 and beyond. They also described the Company as a cash-generating business that had an excellent record of collecting accounts receivable and maintaining a strong net working capital position.

During its meetings with Livingstone and Company management, Incline focused on the Company's revenue trends and the reliability of its figures, including the Company's internal controls, its revenue recognition policies, and its compliance with

4

Generally Accepted Accounting Principles ("GAAP"). Company management represented that the Company generally recognized revenue upon the sale and shipment of finished products to customers, in compliance with GAAP.

Notably, the Prairie Capital Directors did not meet or communicate directly with Incline or other potential acquirers. Instead, they worked behind the scenes to control the flow of information and choreograph the discussions. For example, McNally and Killackey made the final decision about the contents of the CIM. They also had the final say on what materials were posted in the data room, the information that appeared in management presentations, and the talking points for calls and meetings. McNally and Killackey met with Company executives to rehearse their presentations to ensure that the executives conveyed the desired content.

## D.     Incline Loses Out, Only To Be Contacted Again.

In December 2011, Incline submitted an expression of interest in the range of $26 million. After receiving multiple bids, Prairie Capital decided to pursue exclusive negotiations with a different buyer. The negotiations did not bear fruit, and in February 2012, Livingstone contacted Incline. At that point, Prairie Capital regarded the sale process as having fallen behind schedule and was keen to sell the Company as soon as possible.

Livingstone provided Incline with the Company's updated financial statements, including what were represented to be the Company's actual financial results for the 2011 fiscal year and the interim financial statements for January 2012. Several days later, Incline received the Company's interim financial results for February 2012. The financial

5

statements indicated that the Company had continued to meet its sales forecasts and increased its net working capital. In other words, the growth story remained intact.

Based on the additional financial information, Incline increased its offer by $500,000. The offer was conditioned on conducting due diligence and verifying that the Company had met its financial goals for 2011. Incline also conditioned its offer on the Company continuing to meet its monthly sales goals through closing.

Spurred by Prairie Capital's desire to close quickly, the parties identified the end of March as their target date. Incline conducted due diligence throughout March. PriceWaterhouseCoopers LLP ("PwC") assisted Incline in reviewing the Company's accounting and financial information.

During due diligence, Fortin and Vancura described the Company's revenue recognition process. They explained that the Company typically manufactured products only after a customer placed an order, but that because customers often placed orders far in advance, the Company maintained an extensive pipeline of pending orders that might not be manufactured or shipped until a future time. Fortin and Vancura stated that in accordance with the Company's internal accounting policies and GAAP, the Company did not recognize pending orders as revenue until the Company actually manufactured the product, shipped it, and billed the customer. Internally, when the Company shipped a product, its accounting department generated an invoice and billed the customer, which permitted the sale to be recognized as revenue.

**E.     The March 2012 Sales Target**

As the closing date approached, Incline made clear to Fortin and Vancura that the Company's sales during March were critical to Incline's willingness to sign the SPA and close. The March sales figures represented the last opportunity for Incline to assess the Company's growth story. Incline representatives told Company representatives that if the Company missed its March sales figures, they reserved the right to walk away or renegotiate the terms of the deal.

Company management had projected sales of $3.2 million for March 2012 (the "March Sales Target"). Throughout March, Vancura circulated updated sales figures to Incline, Fortin, and the Prairie Capital Directors in the form of a spreadsheet containing a daily listing of the Company's month-to-date billings and cumulative sales (the "Backlog Report"). All of the parties closely monitored the Backlog Report because of the importance of the sales figures to closing the deal.

By mid-March, it became clear that the Company was not on pace to meet the March Sales Target. On March 15, 2012, Incline met with Fortin and Vancura and expressed concern about the Company's sales numbers. Fortin and Vancura represented that the Company had sufficient orders to finish the month strong and meet the March Sales Target.

Despite Fortin and Vancura's reassurances, Incline remained skeptical. Incline had analyzed the Company's historical sales data, which painted a picture inconsistent with Fortin and Vancura's representations about a strong finish to March. Incline therefore asked for additional information to support Fortin and Vancura's claims. Internally,

members of the working group recognized how difficult it would be for the Company to meet the March Sales Target. In an email to Company representatives, a Livingstone representative acknowledged that "$1.1mm in shipments through 3/19 leaves us a long way to get to $3.2mm." The Livingstone representative suggested that the Company prepare analyses "to get [Incline] comfortable" with Fortin's and Vancura's representations.

On March 23, 2013, Vancura provided Incline with a shipment forecast which reflected anticipated shipments for the balance of the month. The document reflected that the Company had shipped orders totaling $1,534,092 through March 23 and would ship another $1,665,186 by the end of the month. The total almost exactly matched the March Sales Target. Incline questioned the Company's ability to ship more product in the last eight days of the month than in the first twenty-three days, but Fortin and Vancura explained that the Company's forecast was accurate and prepared in compliance with its internal policies and GAAP.

In the final week of March, there was extensive back-and-forth about the end-of-month sales figures and whether the level of scheduled shipments represented a departure from the Company's ordinary course of business. Incline and its advisors expressed concern and asked for additional information. Incline made clear that it wanted to review the final sales results for March 2012 before deciding whether to sign and close. In response, Fortin and Vancura assured Incline that its concerns were unfounded, that the Company would meet its targets, and that the Company was operating in the ordinary course of business.

8

Unbeknownst to Incline at the time, the March sales figures were fraudulent. As March progressed and it became clear that the Company would fall short of its goal, Fortin pressured the Company's employees to manufacture product and ship orders. In response, Company employees cancelled previously booked business trips and poured through the Company's pipeline to determine which orders could be manufactured and shipped in March. Internal emails illustrated the pressure Fortin placed on employees. One email emphasized the "critical need to make sure we ship 3.2million [sic] this month," and pointed out that the "window is closing fast."

Despite these efforts, it became clear to Fortin, Vancura, and the Prairie Capital Directors that the Company would miss the March Sales Target by roughly $650,000. Recognizing this shortfall would jeopardize the deal, Fortin, Vancura, and Peretti falsified the Company's financial records to make it appear that the Company achieved the March Sales Target.

For example, on March 30, 2012, at Fortin's direction, Peretti instructed several Company employees to identify pending orders that were closest to their anticipated manufacture or shipping dates. Once identified, employees generated false shipment entries in the Company's recordkeeping system to make it appear that those products actually shipped. The Company backdated these records to avoid arousing suspicion. Under Vancura's supervision, the accounting department produced false invoices and booked revenue in the Company's accounts receivable.

The Prairie Capital Directors—McNally and Killackey—knew about and approved the final sales push and the falsification of documents. During March, Fortin

9

and Vancura updated them on a daily basis. McNally and Killackey knew that the Company was going to fall short of the March Sales Target, and they knew that management fabricated roughly $650,000 of sales in March to make it appear that the Company met its target. Fortin, Vancura, McNally, and Killackey believed that the fraud would not be discovered because Fortin and Vancura would remain in their executive positions after the sale. They could reconcile the Company's records post-closing and make sure everything looked right.

**F.      The Transaction Closes.**

On April 2, 2012, Fortin, Vancura, and a Livingstone representative informed Incline that the Company had achieved the March Sales Target. As support, Vancura sent Incline the Backlog Report for March 2012. The report indicated that the Company had booked $1.7 million in sales during that final week of March, just meeting the $3.2 million target. In reliance on this information, Incline decided to buy the Company. The parties executed the SPA and related agreements on April 4, 2012. They closed the same day.

Pursuant to the SPA, the Buyer paid $27 million for all of the sellers' ownership interests in the Company. The SPA established an escrow fund of $500,000 to fund the parties' respective indemnification obligations. The SPA set out procedures for making an indemnification claim against the escrow fund. The parties agreed that on June 30, 2013 (the "Distribution Date"), any amount remaining in the fund would be distributed to the sellers.

**G. This Litigation**

On June 28, 2013, just two days before the Distribution Date, the Buyer submitted a notice of claims relating to taxes, inventory, overhead, and bad debt (the "Claim Notice"). The Claim Notice also notified the Sellers' Representative that the Buyer believed "Double E, its Subsidiaries, and members of management" had engaged in fraud. It asserted that the Company's financial statements from March 2012 improperly reflected revenue for goods that had not actually been shipped, and that the Company had engaged in a series of activities that improperly inflated revenue and earnings for that month. In the Claim Notice, the Buyer estimated that the fraud caused losses of approximately $2 million. The Claim Notice did not notify the Sellers' Representative about claims for fraud before March 2012.

On September 12, 2014, the Sellers' Representative filed suit against the Buyer to compel the release of the escrow. The Buyer answered on October 29, 2014, the Incline Fund intervened, and together they asserted the Counterclaim against the Prairie Funds, the Prairie Fund Manager, Fortin, and Vancura. For simplicity, this opinion treats Incline as the principal counterclaim plaintiff, rather than referring specifically to the Buyer and the Incline Fund. This opinion similarly treats Prairie Capital as the operative counterclaim defendant, rather than referring specifically to the Prairie Funds and the Prairie Fund Manager.

The Counterclaim contains five separate counts:

- Count I asserts a claim for fraud against Prairie Capital, Fortin, and Vancura. The claim relies on both extra-contractual statements and omissions and on specific representations in the SPA.

11

- Count II asserts a claim against Prairie Capital for aiding and abetting fraud. The claim relies on the same statements and omissions cited in Count I.

- Count III asserts that Prairie Capital, Fortin, and Vancura conspired to engage in fraud. The claim relies on same statements and omissions cited in Count I.

- Count IV seeks indemnification for the Company's alleged breaches of the SPA from a group identified as the Indemnifying Sellers. Section 10.3 of the SPA defined the "Indemnifying Sellers" as the Prairie Funds, Seacoast Capital, TAG Ventures, LLC, High Point Capital Holdings, LLC, Pine Street Capital Partners, L.P., Edward Furlong, Peretti, and Fortin. Although purportedly brought against the Indemnifying Sellers, Count IV only names as a defendant Prairie Capital III in its capacity as the Sellers' Representative. The alleged breaches of contract involve the representations and warranties contained in Sections 3.6(a), 3.12, 3.15, and 3.22 of the SPA, which are also the subject of Counts I, II, and III.

- Count V asserts a separate claim for indemnification from the Indemnifying Sellers. Once again, the count only names Prairie Capital III in its capacity as the Sellers' Representative. The alleged breaches of contract covered by this count involved the Company's compliance with a post-closing covenant to indemnify Incline for taxes and related losses.

The allegations in the Counterclaim depict fraud on a scale beyond what was specified in the Claim Notice. In the Counterclaim, Incline alleges that Fortin and Vancura began to falsify the Company's financial statements in summer 2011, when Prairie Capital first marketed the Company for sale. According to the Counterclaim, after Prairie Capital decided to sell the Company as a growth story, Company management generated the numbers to support that narrative. Fortin and Vancura falsely inflated the Company's monthly sales results by invoicing and including in the Company's accounts receivable orders that had not yet been manufactured or shipped. In some cases, the Company shipped product to non-existent addresses on the last day of the month so the revenue could be booked, only to have the shipments returned shortly thereafter. The Counterclaim cites a preliminary internal audit of the Company's January 2012 sales

which reflects that at least $234,859 (or 10%) of the Company's reported revenue was not supported by products that were manufactured and shipped during that month.

The Counterclaim contends that Fortin and Vancura have interfered with Incline's investigation of the fraud. Incline ultimately fired Vancura in September 2012 and Fortin in July 2013. The Counterclaim contends that they destroyed evidence before leaving, including potentially incriminating emails.

## II.    LEGAL ANALYSIS

The various defendants have moved to dismiss the Counterclaim pursuant to Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted). To the extent the Counterclaim asserts claims for fraud, the defendants also have moved to dismiss on the ground that the allegations lack sufficient particularity as required by Court of Chancery Rule 9(b).

### A.    Count I: The Fraud Claim

Count I of the Counterclaim asserts a claim for fraud against Fortin, Vancura, and Prairie Capital. A claim for fraud requires (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth,

13

(iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Although parts of Count I are dismissed, the claim largely survives at the pleading stage to the extent that Incline relies on representations in the SPA.

### 1. The False Representations

To plead fraud, a plaintiff must identify a false representation. Count I relies on two types of representations. One type is extra-contractual and involves oral and written communications that did not appear in the SPA. *See* CC ¶¶ 272-73. The other type is contractual and involves four representations that appear in the SPA. *See* CC ¶¶ 276.

### a. Extra-Contractual Representations

Count I relies in part on allegedly false representations that the defendants made during the sale process and due diligence. The Counterclaim alleges that

> (i) Fortin, Vancura and [Prairie Capital] fraudulently misrepresented to [Incline] verbally and in written materials that the Company recognizes revenues in its accounts receivable only upon the shipment of finished products, in conformance with GAAP;

> (ii) Fortin, Vancura and [Prairie Capital] fraudulently misrepresented to [Incline] verbally and in written materials that the Company had met or exceeded its internal sales targets (a) throughout the 2011 fiscal year; (b) during January and February of 2012; and (c) during March of 2012; and

> (iii) Fortin, Vancura and [Prairie Capital] fraudulently provided to [Incline] financial statements purportedly reflecting the Company's monthly shipments and revenues during (a) the 2011 fiscal year; (b) January and February of 2012; and (c) March of 2012, which included "revenues" for the sale of products that were not yet sold or shipped to customers during the time-period at issue.

CC ¶ 272. Other sections of the Counterclaim provide additional detail about the oral and written extra-contractual misrepresentations.

Unfortunately for Incline, the SPA forecloses claims of fraud based on extra-contractual misrepresentations. Section 11.10 states:

> The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the Double E Companies. In making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE DOUBLE E PARTIES CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER IN CONNECTION WITH THE TRANSACTION, AND THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF DOUBLE E AND THE SUBSIDIARIES) ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES.

SPA § 11.10 (the "Exclusive Representations Clause").

The SPA backs up the Exclusive Representations Clause with a standard integration clause. Section 11.7 states:

> This Agreement . . . set[s] forth the entire understanding of the Parties with respect to the Transaction, supersede[s] all prior discussions, understandings, agreements and representations and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any Party in connection with the negotiation of the terms hereof.

SPA § 11.17 (the "Integration Clause").

15

Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on other information. *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118-19 (Del. 2012). By specifying the information on which they have relied, parties "minimize[] the risk of erroneous litigation outcomes by reducing doubts about what was promised and said . . . ." *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) (Strine, V.C.). "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Id.* at 1057. *See generally* Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 Del. L. Rev. 49 (2008).

To escape the Exclusive Representations Clause, Incline argues that it does not affirmatively disclaim reliance. "[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations." *Abry*, 891 A.2d at 1059. To be effective, a contract "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) (Strine, V.C.).

The Exclusive Representations Clause is not framed negatively. It does not say that the Buyer did not rely on any representations other than those set forth in the SPA. Instead it is framed positively. It represents affirmatively that the Buyer only relied on the

16

representations and warranties in the SPA. If a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party relied. Delaware law does not require magic words. In this case, the Exclusive Representations Clause and the Integration Clause combine to mean that the Buyer did not rely on other information. They add up to a clear anti-reliance clause.

For the contrary proposition, Incline relies on *Anvil Holding Corp. v. Iron Acquisition Company*, 2013 WL 2249655 (Del. Ch. May 17, 2013). That decision held that two provisions of the parties' contract were not sufficiently specific to foreclose reliance on extra-contractual representations. One provision stated that except for representations and warranties found in specific articles of that agreement, "neither the Company nor any Seller 'makes any other express or implied representation or warranty with respect to the Company . . . or any Seller or the transactions contemplated by this Agreement.'" *Id*. at *8 (alteration in original). The other provision was a standard integration clause. *Id*.

In *Anvil*, the defendants only relied on the two provisions to foreclose a claim of extra-contractual fraud. The transaction agreement actually contained a stronger provision that more closely resembled the Exclusive Representation Clause, but the *Anvil* defendants failed to cite it in their briefs, only raised it for the first time at oral argument, and therefore waived reliance on it. *Id*. at *7. The *Anvil* decision noted that if read in combination with the other provisions, the waived section "appear[ed] to strengthen Defendants argument that the Buyer could not reasonably have relied on extra-contractual representations." *See id*. at *7 n.29. But having restricted its analysis to the

two clauses that the defendants identified, the *Anvil* court found them insufficient to foreclose an otherwise powerful claim to fraud. *Id.* at *8.

I do not read *Anvil* as requiring a specific formula, such as the two words "*disclaim reliance*." 2013 WL 2249655, at *8. Language is sufficiently powerful to reach the same end by multiple means, and drafters can use any of them to identify with sufficient clarity the universe of information on which the contracting parties relied. Transaction planners can limit their risk by using tested formulations, but they need not employ magic words. In this case, the Exclusive Representations Clause and the Integration Clause "add up to a clear anti-reliance clause." *Kronenberg*, 872 A.2d at 593.

### b. Extra-Contractual Omissions

As an alternative means of avoiding the Exclusive Representations Clause, Incline argues that Count I pleads material omissions. According to Incline, even if the Exclusive Representations Clause bars a fraud claim based on extra-contractual representations, the clause has "no application whatsoever to [Incline's] fraudulent omission and concealment claims." Dkt. 89 at 55. In my view, this argument misses the mark. Delaware law permits contracting parties to define in an agreement "those representations of fact that formed the reality upon which the parties premised their decision to bargain." *Abry*, 891 A.2d at 1058. The critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it.

In an arms' length contractual setting like the negotiation of the SPA, a party has no affirmative duty to speak. *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *9 (Del. Ch. July 20, 2010). An affirmative obligation to speak only arises

18

where there is "a fiduciary or other similar relation of trust and confidence" between the parties. 37 C.J.S. Fraud § 33 (West 2015). "In other words, there is no duty to speak absent special circumstances." *Prop. Assoc. 14 v. CHR Holding Corp.,* 2008 WL 963048, at *6 (Del.Ch. April 10, 2008) (Strine, V.C.). Absent a special relationship, a party is under no duty to disclose "'facts of which he knows the other is ignorant' even if 'he further knows the other, if he knew of them, would regard [them] as material in determining his course of action in the transaction in question.'" *Id.* (quoting Restatement (Second) of Torts § 551 cmt. a (1977)).

Of course, if a party in an arms' length negotiation chooses to speak, then it cannot lie. *Stephenson*, 462 A.2d at 1074. And once the party speaks, it also cannot do so partially or obliquely such that what the party conveys becomes misleading. *Id.* Similarly, if the party allows the counterparty to conduct an investigation, the party cannot conceal information. *See id.* That is because permitting the investigation operates as the functional equivalent of providing information. *See id.*

Because a party in an arms' length contractual setting begins the process without any affirmative duty to speak, any claim of fraud in an arms' length setting necessarily depends on some form of representation. A fraud claim in that setting cannot start from an omission. For arm's length counterparties, therefore, contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim. A party may use external sources of information to plead that a contractually identified fact was false or

19

misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete.

There is also a powerful practical rationale underlying this approach. "Every misrepresentation, to some extent, involves an omission of the truth . . . ." *Universal Am. Corp. v. P'rs Healthcare Sols. Hldgs., L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014). Consequently, any misrepresentation can be re-framed for pleading purposes as an omission.[1] If a plaintiff could escape a provision like the Exclusive Representations

---

[1] *See Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("[A]n artfully-pleaded complaint can recharacterize as an omission conduct which more closely resembles a misrepresentation. The labels by themselves, therefore, are of little help.") (internal quotation marks omitted); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119, 1119 n.3 (11th Cir. 1999) (noting that "misrepresentations can so easily be characterized as omissions" and citing an example in which an attorney in the case framed as an omission the fact that defendants "omitted to tell us that the projections they had given us as to how this business was going and how it would do in the future were false"); *Young v. Nationwide Life Ins. Co.,* 183 F.R.D. 502, 510 (S.D. Tex. 1998) (rejecting the plaintiff's effort to reframe alleged misrepresentations as omissions because "such a circular argument would result in every case of misrepresentation becoming a case of omission as a result of the defendant's failure to correct a misrepresentation"); H. Tomas Gomez-Arostegui, *A Comparative Fault Framework for Rule 10b-5 Direct Misrepresentation Actions*, 70 S. Cal. L. Rev. 1407, 1435, 1435 n.143 (1997) ("[M]any misrepresentations can also be characterized as omissions" because "[w]here one has affirmatively misrepresented a material fact it can also be said that one has omitted those material facts that were true"); Janine S. Hiller & Stephen P. Ferris, *Use of Economic Analysis in Fraud on the Market Cases*, 38 Clev. St. L. Rev. 535, 543 (1990) (noting that interpretation of the "misstatement of a fact as the omission of the truth about a fact. . . . would effectively negate the distinction between omission and misrepresentation, since every misrepresentation is an omission of the truth"); L. Brett Lockwood, *The Fraud-on-the-Market Theory: A Contrarian View*, 38 Emory L.J. 1269, 1300 (1989) (noting "the malleability of the misrepresentation/omission distinction"); Donald Eric Remensperger, *Causation in Fraud-on-the-Market Actions—Investors' Insurance in the Second Circuit?; Panzirer v. Wolf*, 49 Brook. L. Rev. 1291, 1296 n.15 (1983) ("The problem that arises as a result of the misrepresentation-omission distinction is that many misrepresentations can also be phrased as omissions.").

Clause by re-framing an extra-contractual misrepresentation as an omission, then the clause would be rendered nugatory. When parties identify a universe of contractually operative representations in a written agreement, they remain in that universe. A party that is later disappointed with the written agreement cannot escape through a wormhole into an alternative universe of extra-contractual omissions.

In this case, the Exclusive Representations Clause defined the universe of information on which the Buyer relied. The Buyer acknowledged that it had "conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the Double E Companies" and the Buyer represented that "the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules" constituted "THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER." SPA § 11.10. These clauses bar not only fraud claims based on extra-contractual representations but also fraud claims based on extra-contractual omissions. By contrast, to credit Incline's argument about extra-contractual omissions would be to create a double-liar problem, because the Exclusive Representations Clause would itself become a lie. At that point, Incline would not have relied solely and exclusively on its own independent investigation and the contractual representations. Incline would be claiming to have relied on information outside of the SPA and an implicit representation that all of that information was both accurate and complete.

21

> For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.

*Abry*, 891 A.2d at 1058.

The allegations of the Counterclaim illustrate how easy it is for a party to recast misrepresentations as omissions. This opinion previously quoted the allegations about extra-contractual misrepresentations that appear in paragraph 272 of the Counterclaim. *See* Part II.A.1.a, *supra.* In paragraph 273, Incline flipped the script and reframed the same issues as omissions:

> Despite pointed questions and inquiries made by [Incline] beginning in the fall of 2011 and continuing through April of 2012 . . ., Fortin, Vancura, and [Prairie Capital] fraudulently concealed, or caused to be concealed, material facts from [Incline] in the following particulars, among others:
>
> (i) Fortin, Vancura, and [Prairie Capital] deliberately withheld and concealed from [Incline] the fact that the Company had not met its sales targets (a) throughout the 2011 fiscal year; (b) during January and February of 2012; and (c) during March of 2012;
>
> (ii) Fortin, Vancura, and [Prairie Capital] deliberately withheld and concealed from [Incline] the fact that the Company had falsified its internal accounting and other records to falsely inflate the Company's revenues and make it appear as those the Company had met its sales targets (a) throughout the 2011 fiscal year; (b) during January and February of 2012; and (c) during March of 2012; and
>
> (iii) Fortin, Vancura, and [Prairie Capital] deliberately withheld and concealed from [Incline] the fact that the Company had drastically deviated from the Company's own internal practices and procedures by including in its accounts receivable "revenues" for the sale of products that were not yet sold or shipped to customers.

CC ¶ 273. The Exclusive Representations Clause and the Integration Clause bar both types of extra-contractual claims.

22

For the contrary proposition, Incline relies on *Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881 (Del. Ch. May 29, 2013). There, the selling party concealed that it had offered a major customer a 5% discount and that there were indications it could lose 50-55% of that customer's business. *Id*. at *2, *7. The purchase agreement at issue included language that the court found sufficiently disclaimed reliance as to "extra-contractual pre-closing representations." *Id*. at *8. Despite that finding, the court concluded there was a claim for fraudulent and active concealment because the Seller made "no representation as to the 'accuracy and completeness' of the information" provided and the buyer did not "disclaim reliance on extra-contractual *omissions*." *Id*. at *8. The court noted that the buyer "reasonably could have relied on the assumption that [the seller] was not actively concealing information that was responsive to [the buyer's] inquiries and that [the seller] was not engaged in a scheme to hide information material to [the purchase of the company]." *Id*. at *9. In coming to this conclusion, the court pointed to two cases which "expressly disclaim[ed] reliance on both the *omission* of information and extra-contractual *representations*." *Id*. (citing *Great Lakes Chem. Corp. v. Pharmacia Corp.* 788 A.2d 544 (Del. Ch. 2001); *In Re IBP, Inc. S'holders Litig.* 789 A2.d 14 (Del. Ch. 2001) (Strine, V.C.)).

To the extent *Transdigm* suggests that an agreement must use a magic word like "omissions," then I respectfully disagree with that interpretation. In my view, a provision like the Exclusive Representations Clause has representation-defining effect, and that effect extends to claims based on omissions. A different rule would render provisions like the Exclusive Representations Clause largely ineffective.

Recasting an allegation as an omission should not enable a party to circumvent an agreed-upon informational definition. Representation-limiting language defines the universe of information on which the contracting party relied. If the contract says that the buyer only relied on the representations in the four corners of the agreement, then that is sufficient. The party may prove that the representations in the four corners of the agreement were false or materially misleading, but the party cannot claim that information it received outside of the agreement, which was not the subject of a contractual representation, contained material omissions.

### c. The Exception To The Exclusive Remedy Provision.

In a final effort to avoid the Exclusive Representations Clause, Incline points to Section 10.7 of the SPA, titled "Exclusion of Other Remedies." It states that

> [e]xcept as provided in [sections relating to post-closing covenants and the payment of a specific note], equitable remedies that may be available, or in the case of fraud, the remedies set forth in this Article X [relating to indemnification] constitute the sole and exclusive remedies for recovery of Losses incurred after the Closing arising out of or relating to this Agreement and the Transaction.

According to Incline, this provision shows that the SPA does not limit its ability to sue for extra-contractual fraud, because it states that the indemnification sections do not operate as the sole and exclusive remedy "in the case of fraud."

Section 10.7 recognizes that a party is not limited to the indemnification framework when it sues for fraud, but Section 10.7 does not address the representations that a party can rely on in those circumstances. Other provisions in the SPA, such as the

Exclusive Representations Clause, perform that function. Section 10.7 does not alter the contractual universe of information on which a fraud-claim can be based.

### d. Contractual Representations

Count I does not only rely on communications made outside of the SPA. Count I also relies on four representations that appear in the SPA: Sections 3.6(a), 3.12, 3.15, and 3.22 of the SPA. The Counterclaim adequately pleads that three of the representations were false when made: Section 3.15, 3.22, and Section 3.6(a) to the extent it addressed the Unaudited Financial Statements.

### i. Section 3.15

Section 3.15 of the SPA is entitled "Absence of Changes." There, the Company represented that

> [s]ince the Latest Balance Sheet Date [defined as January 31, 2012], except as set forth on Schedule 3.15 [which does not list any exceptions], Double E and the Subsidiaries have operated the Business, in all material respects, in the ordinary course of business consistent with past custom and practice. Except as required or contemplated by this Agreement, since June 30, 2011, neither Double E nor any subsidiary has: . . .
>
> (q) collected any Accounts Receivable, or paid any accounts payable, other than in the ordinary course of business; [or]
>
> (r) made any material change with respect to its Business, including without limitation with respect to the products or services it sells, the areas in which such products or services are sold, its methods of manufacturing or distributing its products, the levels of inventory that it maintains, its marketing techniques or its accounting methods; . . .

SPA § 3.15 (the "No Change Representation"). Per the introductory language of Article III, the Company represented that the No Change Representation was true "as of the date of this Agreement," or as of April 4, 2012. SPA, art. III.

25

Through the No Change Representation, the Company made two different representations about two different periods of time. First, the Company represented that from January 31, 2012, until April 4, 2012, the Company operated, "in all material respects, in the ordinary course of business consistent with past custom and practice." Second, the Company represented that from June 30, 2011, until April 4, 2012, the Company had not taken a series of actions, including "collect[ing] any Accounts Receivable, or paid any accounts payable, other than in the ordinary course of its business" and making "any material change with respect to its Business."

> The Counterclaim pleads that in March 2012, the Company
>
> (i) . . . deviate[d] drastically and materially from its own ordinary course of business and internal accounting and other recordkeeping policies and procedures by including in its accounts receivable "revenues" from the sale of products that were not yet sold or shipped to the customer; . . .
>
> (iii) . . . include[d] in its accounts receivable revenues that were not collected or generated in the ordinary course of business; and
>
> (vi) . . . deliberately falsif[ied] its own internal accounting and other records to make it appear as though the Company's inclusion of false "revenues" in its accounts receivable did not constitute a drastic alteration of the Company's internal practices and procedures.

CC ¶ 219. Regarding pre-March 2012 conduct, the Counterclaim pleads that Fortin and Vancura, with the knowledge of the Prairie Capital Directors, "had been falsifying the Company's financial statements and sales figures since at least as early as the summer 2011 . . . to maintain the appearance of an upward trend in revenues." CC ¶ 198. On occasion, Vancura instructed "employees to ship previously manufactured products to false or non-existent addresses on the last day of a given month, only to have those

26

shipments returned to the Company and incur thousands of dollars of unnecessary shipping costs . . . ." *Id.* ¶ 200. These allegations sufficiently plead that the No Change Representation was false when made.

### ii.     Section 3.22

Section 3.22 of the SPA is entitled "Accounts Receivable." This representation also has two parts. In the first part, the Company represented that "Schedule 3.22 contains a complete and accurate list of all Accounts Receivable as of January 31, 2012 and sets forth the aging of each such Account Receivable." SPA § 3.22 (bold font omitted). In the second part, the Company represented that

> [a]ll Accounts Receivable (a) represent valid obligations arising from sales actually made or services actually performed by Double E or the Subsidiaries in the ordinary course of business consistent with past practice; (b) to Double E's Knowledge, are not subject to any disputes, material defenses, counterclaims or rights of setoff; and (c) have been billed and are generally due and payable within 30 days after billing.

*Id.* The Company again represented that this statement was true "as of the date of this Agreement," or April 4, 2012. SPA, art. III.

In an effort to limit the second part of the representation, Prairie Capital contends that it only applies to "Accounts Receivable as of January 31, 2012." If that were true, then the representation would not extend to Accounts Receivable in February or March 2012, when the most blatant acts of fraud allegedly took place. The January 31 date, however, only modifies the list of Accounts Receivable in the first sentence of the representation. It does not limit the second sentence of the representation, which applies to "[a]ll Accounts Receivable." Nor is there any temporal limitation in the definition of

Accounts Receivable, which "means all accounts receivable and other rights to payment from clients or customers of Double E or any Subsidiary, including all accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered by Double E or any Subsidiary . . . ." SPA, art. I.

> The Counterclaim pleads that Fortin and Vancura
>
> (i) caused the Company's accounts receivable to not represent valid obligations arising from sales actually made or services actually performed by the Company in the ordinary course of business consistent with past practice; and
>
> (ii) caused the Company's accounts receivable to include amounts that were not due and payable within thirty days after billing.

CC § 222. The Counterclaim alleges that Fortin and Vancura falsely and repeatedly "inflated the Company's monthly sales results by invoicing and including in the Company's accounts receivable orders that had not yet been manufactured or shipped to customers." CC § 199. The Company also shipped goods to nonexistent addresses so that "revenue" could be booked in the Company's accounts receivable. CC § 200. These allegations sufficiently plead that the Accounts Receivable representation was false when made.

### iii.     Section 3.6(a)

Section 3.6 is entitled "Financial Statements and Undisclosed Liabilities." In subsection (a), the Company made the following representation:

> Double E has delivered or made available to the Buyer copies of the Financial Statements. Except as set forth on Schedule 3.6(a), each of the Financial Statements fairly presents on a consolidated basis, in all material respects, the financial condition of Double E and the Subsidiaries as of its respective date, and the results of operations of Double E and the

28

Subsidiaries for the periods related thereto in accordance with GAAP consistently applied throughout such periods, subject, in the case of the Unaudited Financial Statements, to year-end adjustments (which are not expected to be material) and the absence of footnote disclosure.

SPA § 3.6(a) (bold font omitted) (the "Financial Statement Representation"). The Company represented that this statement was true "as of the date of this Agreement"—April 4, 2012—but the representation itself states only that each set of Financial Statements "presents on a consolidated basis, in all material respects, the financial condition of Double E and the Subsidiaries *as of its respective date . . . .*" *Id.* (emphasis added). For the Financial Statement Representation to be accurate, the referenced Financial Statements had to accurately reflect on April 4, 2012, the financial condition of the Company as of the respective dates of the Financial Statements.

The SPA defines "Financial Statements" as "collectively, the Audited Financial Statements and the Unaudited Financial Statements." SPA, art. I. The SPA defines the "Audited Financial Statements" as "the Latest Audited Balance Sheet and the related audited consolidated statements of income, cash flow and member's equity of Double E and the Subsidiaries for the fiscal year ended December 31, 2010." *Id.* The SPA defines the "Latest Audited Balance Sheet" as "the audited consolidated balance sheet of Double E and the Subsidiaries as of December 31, 2010." *Id.* The SPA defines the Unaudited Financial Statements as "the Latest Balance Sheet and the related unaudited consolidated statements of income, cash flow and member's equity of Double E and the Subsidiaries for the one (1)-month fiscal period then ended." *Id.* The SPA defines "Latest Balance Sheet" as the "unaudited consolidated balance sheet of Double E and the Subsidiaries as

29

of the Latest Balance Sheet Date." *Id.* The SPA defines the "Latest Balance Sheet Date" as January 31, 2012. *Id.*

Given these definitions, the Company represented the accuracy of:

- Its audited year-end financial statements as of December 31, 2010.

- Its unaudited consolidated balance sheet as of January 31, 2012.

- Its unaudited consolidated statements of income, cash flow, and member's equity for the one (1)-month fiscal period as of January 31, 2012.

Notably, none of these dates encompass the February or March 2012 time frame. Any claim that the Financial Statement Representation was false must rest on allegations that would call into question the identified financial statements, meaning it must rest on alleged misconduct before January 31, 2012.

The Counterclaim sufficiently alleges that the Financial Statement Representation was false when made as it related to the Unaudited Financial Statements. The Counterclaim alleges that

> [Incline's] recent internal preliminary audit of the Company's January 2012 sales results has revealed that at least $234,859 (or 10%) of the Company's total reported revenues for that month were comprised of invoices for products that were not manufactured and shipped to customers during that month. In other words, 10% of the Company's reported revenues for January 2012 were simply a lie, resulting in a financial statement that was materially false.

CC ¶ 201. The Counterclaim contains more general allegations regarding the practices at the Company during 2011. *See*, *e.g.*, *id.* ¶ 198 ("Fortin and Vancura – with knowledge of the [Prairie Capital Directors] – had been falsifying the Company's financial statements and sales figures since at least as early as the summer 2011, when [Prairie Capital] first

30

commenced efforts to market the Company for sale, in order to maintain the appearance of an upward trend in revenues."); ¶ 199 ("Month after month, Fortin and Vancura falsely inflated the Company's monthly sales results by invoicing and including in the Company's accounts receivable orders that had not yet been manufactured or shipped to customers."). The combination of the specific example and the more general allegations is sufficient to plead that the Financial Statement Representation was false as it related to the Unaudited Financial Statements.

By contrast, the Counterclaim does not contain allegations sufficient to plead that the Financial Statement Representation was false when made as it applied to the Audited Financial Statements. The Financial Statement Representation regarding the Audited Financial Statements only covered periods before December 31, 2010. The Counterclaim does not include any allegations of misconduct before 2011.

### iv. Section 3.12

Section 3.12 is entitled "Compliance with Laws." It states: "Except as set forth on Schedule 3.12, since December 31, 2007, Double E and each Subsidiary have complied, and are in compliance, in all material respects, with all Laws applicable to Double E or such Subsidiary or to the operation of the Business." SPA § 3.12 (bold font omitted). The SPA defines "Law" as "any U.S. or foreign federal, national, state or local law, common law, statute, ordinance, order, code, rule or regulation, promulgated or issued by any court or Governmental Authority." SPA, art. I.

The Counterclaim does not sufficiently allege that Section 3.12 was false when made. According to the Counterclaim, the Company breached

31

its representations and warranties to [Incline] set forth in Section 3.12 when [it] violated Delaware law (among others) by fraudulently inducing [Incline] to enter into the SPA and to pay approximately $27 million for the Company by (i) deliberately misrepresenting highly material information regarding the Company's sales results, accounting practices and financial condition for March 2012 as well as earlier periods; and (ii) deliberately concealing and withholding highly material information regarding the Company's sales results, accounting practices and financial condition for March 2012 as well as earlier periods.

CC ¶ 226.

This is a bootstrapped claim. Incline purports to allege a failure to comply with applicable law by citing the same acts that it claims constitute fraud under other sections of the SPA. If Incline proves its case, those wrongs can be addressed under the other sections. They do not give rise to a separate breach of Section 3.12.

### e. The Defendants Who Can Be Held Accountable For The Contractual Representations.

For the reasons set forth in the preceding sections, Incline has pled that three representations in the SPA were false when made: Sections 3.15, 3.22, and 3.6(a) as applied to the Unaudited Financial Statements. The named defendants contend that they cannot be accountable for any of the representations because they were made only by the Company.

The speaker who makes a false representation is, of course, accountable for it.[2] But a party also is accountable "if the misrepresentation, although not made directly to

---

[2] *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) (noting that the first element of a common law fraud claim is "a false representation, usually one of fact, made by the defendant"); *accord* Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for

the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction . . . ." Restatement (Second) of Torts § 533. "If the misrepresentation is made for the purpose of having it communicated, the maker is subject to liability." *Id.* cmt. d.

Flesh and blood humans also can be held accountable for statements that they cause an artificial person, like a corporation, to make. "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law." *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 636 (1819). "[B]eing a purely metaphysical creature, having no mind with which to think, no will with which to determine and no voice with which to speak, [a corporation] must depend upon the faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated." *N. Assur. Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924) (Wolcott, C.). Because it lacks a body and mind, a corporation only can act through human agents.[3]

---

the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability . . . .").

[3] *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014) (recognizing that a corporation is "a distinct legal entity" that "can act only through its agents" (internal quotation omitted)); *Braswell v. U.S.*, 487 U.S. 99, 110 (1988) ("Artificial entities such as corporations may act only through their agents."); *Mallinckrodt Chem. Works v. State of Mo. ex rel. Jones*, 238 U.S. 41, 56 (1915) ("Corporations, unlike individuals, derive their very right to exist from the laws of the state; they have perpetual succession; and they act only by agents."); *Transpolymer Indus., Inc. v. Chapel Main Corp.*, 582 A.2d 936 (Del. 1990) (ORDER) ("[A] corporation, being an artificial entity, can only act through its

As the human through which the corporate principal acts, "[a] corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant." *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009) (internal quotation marks omitted) (Strine, V.C.). "This includes situations where a corporate agent participates in corporate fraud." *Id.* "It is immaterial that the corporation may also be liable." 3A William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 1135, at 231 (perm. ed., rev. vol. 2011) "A corporate officer or agent who commits fraud is personally liable to a person injured by the fraud." *Id.* § 1143, at 273. Therefore, "[a]n officer actively participating in the fraud cannot escape personal liability on the ground that the officer was acting for the corporation." *Id.* at 273-76; *accord* 19 C.J.S. Corporations § 642 (West 2015).

In *Abry*, Chief Justice Strine, then a Vice Chancellor, considered how to apply these principles to representations made by "the Company" in a stock purchase

---

agents."); *E. Shore Nat. Gas Co. v. Glasgow Shopping Ctr. Corp.*, 2007 WL 3112476, at *3 (Del. Super. Oct. 3, 2007) ("A corporation can only act through designated agents."); *First State Constr. Co. v. Del. Lumber & Millwork, Inc.*, 1998 WL 439441, at *2 (Del. Super. June 22, 1998) ("[A] corporation can only act through its agents . . . ."); *Shields v. Welshire Dev. Co.*, 144 A.2d 759, 763 (Del. Ch. 1958) ("[A] corporation must act through agents . . . ."); *Atl. Ref. Co. v. Ingalls & Co.*, 185 A. 885, 885 (Del. Super. 1936) ("A corporation necessarily acts through its agents . . . ."); *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 156 A. 350, 351 (Del. Super. 1931) ("A corporation is an artificial being created by law. . . . Being artificial and the mere creature of the law, it can only act by its officers and agents.").

34

agreement. Like the SPA, the agreement in *Abry* distinguished between representations

made by the company and a different set of representations made by selling stockholders:

> The Agreement did not conflate the Seller with the Company and make it responsible for everything the Company and the Company's management did or said. Rather, the Seller only accepted responsibility for the Company's actions and words to the extent set forth in the Agreement . . . .

891 A.2d at 1041.

After concluding that the plaintiff had pled a claim for fraud against the company

based on its contractual representations, the Chief Justice considered to what degree other

parties, such as the selling stockholders, could be liable for the company's

representations. Although under the terms of the stock purchase agreement only the

company made the representations, the Chief Justice held that as a matter of public

policy, the scope of a claim for contractual fraud swept more broadly:

> To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State. That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either: 1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty.

*Id.* at 1064.

At the pleading stage, it is reasonably conceivable that Fortin and Vancura can be

held liable for fraudulent contractual representations made by the Company because the

Counterclaim sufficiently alleges that they knew that the representations were false. The

Counterclaim also sufficiently alleges that they were the humans through which the

Company made its representations. Fortin and Vancura were members of the working

35

group. They monitored and directed the Company's day to day business activities. They communicated directly with Incline representatives on a regular basis throughout the sales process, both during formal presentations and informal dinner meetings. At every turn, Fortin and Vancura spoke for the Company, detailing the particulars of the operation, including explanations regarding revenue recognition and sales results. And they approved all documents and reports before anything was sent to Incline. In other words, Fortin and Vancura were the brains behind the Company's business activities and the voice that relayed the details of those activities to the world.

At the pleadings stage, it is likewise reasonably conceivable that the Prairie Funds and the Prairie Fund Manager can be held liable for fraudulent contractual representations made by the Company. The Counterclaim sufficiently alleges that the Prairie Capital Directors knew that the Company's representations were false. The Counterclaim also sufficiently alleges that the Prairie Capital Directors made statements to Fortin and Vancura and Livingstone intending for those statements to be repeated to Incline. For example, the Prairie Capital Directors

> participated in numerous conference calls regarding the preparation of the written Double E Management Presentation, made numerous revisions to, and ultimately approved, that document before its dissemination to [Incline]. Indeed, [Prairie Capital was] so intricately involved in the sales process that one or both of the [Prairie Capital Directors] flew out to the Company's headquarters to *rehearse* the management presentation with [Fortin and Vancura] shortly before that presentation was given to [Incline].

CC § 116. The Prairie Capital Directors oversaw the entire process and "affirmatively encouraged, assisted or approved the fraudulent scheme, including by approving or directing Vancura and Fortin to provide the false sales numbers for March 2012 to

36

[Incline], and then stood by silently while [Incline] closed the transaction under false pretenses." CC ¶ 183.

### 2. The Remaining Elements Of Fraud

Identifying a false statement for which the defendant is accountable only satisfies the first element of a fraud claim. A plaintiff also must plead that the defendants charged with fraud knew the statement was false or acted with reckless indifference to its truth, and that they intended to induce reliance on the statement. In addition, the plaintiff must plead that the plaintiff reasonably relied on the representation and suffered causally related damages. *Stephenson*, 462 A.2d at 1074.

A defendant's state of mind, including its knowledge and intent, "may be averred generally." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.,* 829 A.2d 143, 158 (Del. Ch. 2003). This means a plaintiff need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false. For the reasons discussed in the preceding section, the Counterclaim sufficiently alleges that Fortin, Vancura, and Prairie Capital knew that the contractual representations were false when made.

When a party sues based on a written representation in a contract, as Incline has done here, satisfying the remaining elements at the pleading stage is relatively straightforward. It is reasonably inferable that the defendants intended to induce reliance on the representations because they appeared in a written agreement. For the same reason, it is reasonably inferable that the plaintiff relied on the representations when entering into the agreement. The plaintiff can claim causally related harm because it

37

entered into an agreement it otherwise would not have signed. In this case, Incline sufficiently alleges that it acquired a company it would not have purchased, or at least would have paid materially less to own. For purposes of a claim based on the contractual representations, Incline has covered all of the elements of a fraud claim.

### 3.      Rule 9(b)

Finally, the defendants correctly observe that when evaluating Count I, the allegations of the Counterclaim must be measured against the requirements of Rule 9(b), which requires that fraud be pled with particularity. This means that a plaintiff must allege "the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim." *Abry,* 891 A.2d at 1050. The relevant circumstances are "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation." *Trenwick Am. Litig. Tr. v. Ernst & Young LLP,* 906 A.2d 168, 207-08 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett,* 931 A.2d 438 (Del. 2007).

When a party sues based on a written representation in a contract, as Incline has done here, it is relatively easy to plead a particularized claim of fraud. The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract. Having pointed to the representations, the plaintiff need only allege facts sufficient to support a

38

reasonable inference that the representations were knowingly false. For the reasons set forth previously, Incline has done that.

## B.      Counts II and III: Secondary Liability For Fraud

Counts II and III of the Counterclaim seek to impose secondary liability for fraud on Prairie Capital. Count II frames the basis for secondary liability in terms of aiding and abetting. Count III frames the basis for secondary liability in terms of conspiracy, and adds Fortin and Vancura as defendants. The two concepts are closely connected and often used interchangeably. In this case, the Counterclaim adequately pleads a basis for secondary liability under both headings.

Section 876 of the Restatement (Second) of Torts identifies the parameters of secondary liability. It states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The three clauses of Section 876 thus distinguish between someone who takes action "in concert with the other pursuant to a common design" under clause (a) and someone who "gives substantial assistance" to the tortious actor, with or without a common design, under clauses (b) and (c). When secondary liability is premised on an agreement or

39

common design, the theory is typically framed in terms of a "conspiracy." When secondary liability is premised on providing substantial assistance, the theory is typically framed as "aiding and abetting." In some cases, the distinction makes a difference.[4] In others, it doesn't.[5]

---

[4] *See Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.,* 2012 WL 6632681, at *18-20 (Del. Ch. Dec. 20, 2012) (analyzing claim for aiding and abetting a breach of fiduciary duty separately from conspiracy to commit a breach of fiduciary duty); *Hospitalists of Del., LLC v. Lutz,* 2012 WL 3679219, at *15-16 (Del. Ch. Aug. 28, 2012) (same); *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004) (recognizing that "[b]ecause it focuses on assistance, rather than agreement, aiding-abetting rests on a broader conceptual base, one which may overlap conspiratorial conduct, or exist independent of it" and that "[u]nlike conspiracy . . . aiding-abetting liability may flow from negligent conduct.") (internal citations omitted); *accord* Erin M.B. Leach, *Joint Patent Misappropriation: An Appropriate Solution to Joint Patent Infringement*, 82 U. Chi. L. Rev. 1023, 1050 (2015) (noting that although similar, there are some "subtle differences" between a claim for civil aiding and abetting and civil conspiracy, including the "crucial distinction . . . that aiding and abetting requires an agreement, while conspiracy does not"); Nathan Isaac Combs, *Civil Aiding and Abetting Liability*, 58 Vand. L. Rev. 241, 259 (2005) ("In sum, while the civil theories of conspiracy and aiding and abetting often overlap, several notable distinctions warrant diligence by the courts to respect the autonomy of the two theories.").

[5] *Malpiede v. Townson*, 780 A.2d 1075, 1098 n.82 (Del. 2001) (noting in reference to underlying claim for breach of fiduciary duty that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here"); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) (noting that in the fraud context. showing aiding and abetting would necessarily require showing "the elements of civil conspiracy were satisfied," and therefore "the aiding and abetting fraud claim may be duplicative of the civil conspiracy count"); *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("A claim for conspiracy to commit a breach of fiduciary duty is usually pled as a claim for aiding and abetting, and although there are differences in how the elements of the two doctrines are framed, it remains unclear to me how the two diverge meaningfully in substance or purpose."); *Carsanaro v. Bloodhound Tech., Inc.,* 65 A.3d 618, 642 (Del. Ch. 2013) (finding that claims for aiding and abetting a breach of fiduciary duty and conspiracy to commit a breach of fiduciary duty have only "nuanced differences" and are "functionally equivalent"); *Triton Const. Co., Inc. v. E.*

What matters for purposes of the motion to dismiss is whether the Counterclaim alleges sufficient facts to support an inference that Prairie Capital either (i) "acted in concert with" Fortin, Vancura, and the Company for purposes of the fraudulent representations in the SPA, or (ii) gave "substantial assistance" to Fortin, Vancura, and the Company in connection with the fraudulent representations in the SPA. The allegations of the Counterclaim satisfy the Rule 12(b)(6) standard.

In *Great Hill*, Vice Chancellor Glasscock allowed a similar claim for secondary liability to proceed under analogous facts. *See* 2014 WL 6703980, at *21. As here, the pleading alleged that representatives of a sell-side private equity firm "were actively involved in [the] sales process. . . . [and] attended board meetings and received a variety of information about the Company in connection with their director roles." *Id*. at *3. As here, the private equity directors in *Great Hill* were involved in the review process of disseminated information (including documents posted in the data room), and "had

*Shore Elec. Servs., Inc.,* 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) (finding that claim for aiding and abetting breach of fiduciary duty duplicated claim for civil conspiracy), *aff'd,* 988 A.2d 938 (Del. 2010) (TABLE); *Allied Capital Corp. v. GC–Sun Hldgs., L.P.,* 910 A.2d 1020, 1038 (Del. Ch. 2006) (Strine, V.C.) (stating that "courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law"); *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (equating claim for aiding and abetting breach of fiduciary duty with conspiracy to commit breach of fiduciary duty), *aff'd,* 906 A.2d 114 (Del. 2006); *Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116, 131 (Del. Ch. 1986) ("A claim for civil conspiracy (sometimes called 'aiding and abetting') requires that three elements be alleged and ultimately established...."); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch. 1984) (identifying the same elements for "a claim of civil conspiracy" as for aiding and abetting), *aff'd,* 575 A.2d 1131 (Del. 1990).

control over the Company's CEO, the apparent ringleader of the alleged fraud." *Id*. at *21. Vice Chancellor Glasscock acknowledged that the directors' close involvement in the sales process "supports an inference that they were aware of the catastrophic problems with [a major customer] and of [the company's] deeply misleading disclosures." *Id*. (internal quotation marks omitted). "Taking all reasonable inferences in the Plaintiffs' favor, I agree that these pleadings adequately allege facts from which I may infer knowing participation in the underlying wrong by [the private equity directors] so as to meet the minimal requirements to survive a motion under Rule 12(b)(6)." *Id*.

In this case, the Counterclaim sufficiently alleges that Prairie Capital's desire to sell provided the impetus for the sale, that the Prairie Capital Directors oversaw the sale process as part of the working group, and that they actively participated in the creation and approval of the information that was distributed to buyers. For example, the Counterclaim alleges that the Prairie Capital Directors "flew out to the Company's headquarters to *rehearse* the management presentation with [Company management] shortly before that presentation was given to [Incline] . . . ." CC ¶116. The Counterclaim also alleges that

> Fortin and the [Prairie Capital Directors] received and closely monitored Vancura's backlog reports as well, and the [Prairie Capital Directors] authorized or instructed Fortin and Vancura to circulate those updated figures to [Incline]. After all, they knew full well that [Incline was] keenly focused on the March 2012 Sales Target, and they knew that Company had to hit that target in order to close the transaction on the previously agreed terms.

*Id.* ¶ 148. The Counterclaim further alleges that the Prairie Capital Directors were "actively and closely involved in choreographing discussions with potential acquirers"

42

and "provided extensive input to Livingstone and Double E management as to the information that should be posted to the Data Room and disseminated during presentations to, and meetings and calls with, [Incline] . . . ." *Id.* ¶ 115.

As additional support, the Counterclaim cites emails between Livingstone and other members of the working group, including the Prairie Capital Directors. *See* CC ¶¶ 114, 153, 159. In one email, a representative of Livingstone told the group that

> [t]he crux of the meetings, and indeed the ultimate transaction value, clearly revolves around the growth story, and the heavy (P&L) investment the company has made over the past year readying the organization for such growth. The groups we met with seem compelled by the growth opportunities afforded [by certain of the Company's newly acquired lines and products] and continued expansion in the Company's global sales and marketing efforts."

CC ¶ 114 (alteration in original). This email supports the allegation in the Counterclaim that Prairie Capital understood the importance of the growth story and the importance of providing information to Incline and other potential buyers that was consistent with that narrative. The Counterclaim cites another email in which a Livingstone representative acknowledged that the shipments made by the Company through March 19 "leaves us a long way to get to $3.2mm," *viz.* the March Sales Target, "and suggested preparing analyses 'to get [Incline] comfortable' with Fortin's and Vancura's representations that the Company 'had orders sufficient to have a strong month-end and would therefore meet the March 2012 Sales Target.'" CC ¶ 153. This email supports an inference that the members of the working group knew the Company was falling short, needed to convince Incline that it would hit the March Sales Target, and sought to prepare documents and

script oral communications to accomplish that goal. In other words, it supports the secondary actors' involvement in the fraud theory set out in the Counterclaim.

These allegations are sufficient to support liability at the pleading stage under a conspiracy theory. The same is true for purposes of giving substantial assistance and encouragement under the concept of aiding and abetting.

## C.    Count IV: The Indemnification Claim

The Counterclaim sets out claims for indemnification in Counts IV and V, but the Sellers' Representative has only moved to dismiss Count IV. This claim seeks indemnification for breaches of representations and warranties in the SPA based on the same representations and underlying facts that support the fraud claim.

Unlike the fraud claim, Count IV is a contractual claim subject to the limitations that the parties included in the SPA. *See*, *e.g.*, SPA §§ 10.1(a), 10.3(a), 10.3(b)(i)-(iii). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

Section 10.1(a) of the SPA required that Incline give notice of its indemnity claims. It stated, in relevant part:

> No Buyer Indemnified Party will be indemnified and held harmless for any liability for a breach of any representation or warranty in Article III of this Agreement unless the Sellers' Representative is given written notice from such Buyer Indemnified Party asserting a claim, with reasonable supporting details for such claim, on or before the Survival Date [June 30, 2013]. . . .

44

SPA § 10.1(a) (bold font omitted). An adequate notice, therefore, need only be in writing and include "reasonable supporting details for such claim."

On June 28, 2013, the Buyer sent the five-page Claim Notice to the Sellers' Representative. That notice described the Buyer's claims, including specific allegations that the Company had breached Sections 3.6 and 3.22 of the SPA. The Claim Notice identified specific issues about inaccurate financial statements, non-compliance with GAAP, misconduct during March 2012, and alleged damages. It also included damages calculations based upon those breaches.

The Sellers' Representative agrees that the Claim Notice was sufficient as to claims under Sections 3.6 and 3.22 of the SPA for conduct that occurred in March 2012. Instead of contesting the adequacy of the notice, the Sellers' Representative argues that the representations were not breached. The Claim Notice contained substantially the same allegations as the Counterclaim, and this decision already has held that those allegations support a claim that the representations were false when made. For the same reasons, the allegations support a claim for indemnification.

The Sellers' Representative disputes that the Claim Notice sufficiently identified a claim under Section 3.15 of the SPA for conduct in March 2012 because the notice did not reference that section by number. The SPA does not require that the Buyer specify the precise section that was breached; it only requires reasonable notice of the claim. The parties could have bargained for an obligation to specify a particular section, but they did not do so here. By describing in detail the events that took place in March 2012, the

Buyer gave the Sellers' Representative reasonable notice of the claim, including a claim for breach of Section 3.15.

As to events that pre-dated March 2012, the Sellers' Representative argues that the Buyer cannot maintain an indemnification claim for those periods because the Claim Notice did not identify any earlier problems. On this issue, the Sellers' Representative is correct. To permit the Buyer to treat a notice relating to claims about March 2012 as a placeholder for later asserted claims regarding earlier time periods would contravene the notice requirement. *See Winshall v. Viacom Int'l Inc*, 2012 WL 6200271, at *8 (Del. Ch. Dec. 12, 2012) (Strine, C.), *aff'd*, 76 A.3d 808 (Del. 2013). The Buyer can pursue the earlier time periods under a fraud theory, where the contractual limitations do not apply, but not under an indemnification theory, where they do. *Abry* forecloses the contractual limitations from barring the claim for fraud, but the provisions still will have done their job, because the Buyer must prevail under the more onerous standards that govern a fraud claim.

## III.  CONCLUSION

The motion to dismiss is granted to the extent that the Buyer and the Incline Fund claim (i) to have relied on misrepresentations or omissions outside of the SPA, (ii) that Section 3.6(a) of the SPA falsely represented the accuracy of the Company's Audited Financial Statements (a term defined in the SPA), or (iii) that Section 3.12 of the SPA falsely represented that the Company was in compliance with all applicable law. The motion to dismiss also is granted to the extent Count IV seeks indemnification for periods pre-dating March 2012. Otherwise the motion to dismiss is denied.