# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CHYRONHEGO CORPORATION, VECTOR CAPITAL CORPORATION, and VECTOR CH HOLDINGS 2 (CAYMAN), L.P., <br><br> Plaintiffs, <br><br> v. <br><br> CLIFF WIGHT and CFX HOLDINGS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) C.A. No. 2017-0548-SG ) ) ) ) ) ) ) |

## <u>MEMORANDUM OPINION</u>

Date Submitted: April 18, 2018
Date Decided: July 31, 2018

A. Thompson Bayliss and E. Wade Houston, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Peter M. Stone, of PAUL HASTINGS LLP, Palo Alto, California, *Attorneys for Plaintiffs*.

D. McKinley Measley and Daniel T. Menken, of MORRIS, NICHOLS, ARSHT, & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Overton Thompson, III and Joseph B. Crace, Jr., of BASS BERRY & SIMS PLC, Nashville, Tennessee, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

A few companies so dominate their field of enterprise that the name of their product enters the language, not as a proper noun, but as a regular noun or verb. This matter involves one such company, Chyron, now known as ChyronHego.[1] This action involves a dispute arising from ChyronHego's acquisition of another electronic-effects company, Click Effects. According to ChyronHego, the Defendants—the sellers of Click Effects—fraudulently misrepresented the actual condition and value of the company, damaging ChyronHego. The latter brought this suit, and the Defendants have moved to dismiss.

This matter, in part, implicates two fundamental precepts of Delaware law, in tension. Our law supports freedom of contract, holding parties to their bargains, good and bad. The same respect for the free exchange of property from which the foregoing precept arises means that our law abhors fraud, which is inimical to free exchange, properly understood. The tension arises when parties to a contract purport in their agreement to limit the universe of facts upon which that agreement rests, when in actuality one party has made extra-contractual representations upon which the other has relied. The tension is resolved in our law thus: where the parties in language that is clear provide that they eschew reliance on any facts but those recited, they will be held to that representation, notwithstanding prior knowingly false

---

[1] According to research done via another company whose name has become part of English vocabulary, Google, Chyron took its name from the centaur of Greek myth.

statements made by one party to the other. Such representations, therefore, cannot form the basis for common-law fraud, because the complaining party cannot, in light of the contractual provision, have reasonably relied on the prior false statements. Reasonable reliance is an element of common-law fraud. Conversely, where the contract is ambiguous, or where it merely recites that the parties meant to integrate all their prior dealings into its terms, that contract does not preclude a party's proof of extra-contractual fraud.

Here, the parties contest whether the contract at issue contains an effective anti-reliance clause precluding ChyronHego from proving prior extra-contractual fraud. I find that the Stock Purchase Agreement, read as a whole, does unambiguously so provide, and that claims in the Complaint alleging extra-contractual fraud must be dismissed.

The Defendants also seek to dismiss the remainder of the Complaint, contending that allegations of fraudulent misrepresentation in the contract are insufficiently pled, and that claims for indemnification are precluded by failure of notice required by the Stock Purchase Agreement. I find that most of the Plaintiffs' allegations, under the plaintiff-friendly standards of a motion to dismiss, are sufficient to state claims.

The Motion to Dismiss, therefore, is granted in part and denied in part. My reasoning is below.

# I. BACKGROUND[2]

## A. *The Parties and Relevant Non-Parties*

Plaintiff Vector Capital Corporation ("Vector Capital") is a Delaware corporation.[3] Vector Capital owns Plaintiff ChyronHego Corporation ("ChyronHego"), a New York corporation with a principal place of business in Melville, New York, through its fund Plaintiff Vector CH Holdings 2 (Cayman), L.P., a Cayman Islands exempted limited partnership.[4] ChyronHego is a "leading creator of the graphics used in live television broadcasts and in other media," with offices around the world.[5] The Plaintiffs bought a company from the Defendants and bring this action for fraud and breach of a written stock purchase agreement.[6]

Defendant Cliff Wight is a citizen of Tennessee.[7] Wight was the owner and President of non-party Sound & Video Creations, LLC (d/b/a Click Effects) ("Click Effects" or the "Company"), which he sold to ChyronHego for approximately $12.5 million in cash and equity.[8] Click Effects creates graphics and other media for high

---

[2] The facts, drawn from the Plaintiffs' Amended Complaint and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[3] Verified Amended Complaint (the "Complaint" or the "Compl.") ¶ 11.
[4] *Id.* ¶¶ 4, 13–14.
[5] *Id.* ¶¶ 4, 17.
[6] *Id.* ¶ 1.
[7] *Id.* ¶ 15.
[8] *Id.* ¶¶ 5–6, 15.

schools, colleges, and professional sports teams in their stadiums.[9] Wight sold Click Effects to ChyronHego by transferring ownership of Click Effects to Defendant CFX Holdings, Inc. ("CFX"), a Tennessee corporation created to facilitate the sale, which received cash and equity in the sale of Click Effects to ChryonHego.[10] Wight was the only principal of CFX.[11]

*B. Factual Background*

### 1. Deal Proposal and Due Diligence

The Complaint is silent about how or when ChyronHego became interested in acquiring Click Effects. At some point, ChyronHego explored an acquisition of Click Effects due to Click Effects' "cutting-edge products and stable customer base" in the same industry as ChryonHego.[12] ChyronHego began a due diligence process: Wight and Click Effects uploaded documents to a data room from March through June 2016, including details about customers, contracts, and financial projections.[13] In addition, the Defendants provided certain financial information in connection with a "quality of earnings report" prepared by the Plaintiffs.[14] The Plaintiffs and

---

[9] *Id.* ¶¶ 5, 18.
[10] *Id.* ¶¶ 1, 16.
[11] *Id.* ¶ 16.
[12] *Id.* ¶¶ 5, 19.
[13] *Id.* ¶¶ 19–20.
[14] *Id.* ¶ 24.

4

the Defendants entered into a stock purchase agreement (the "SPA") on July 1, 2016, which included certain representations by the Defendants.[15]

The Plaintiffs allege that, in addition to truthful data, the data room contained misleading documents and projections.[16]  The Plaintiffs also contend that the Defendants provided misleading information in connection with the Plaintiffs' preparation of the quality of earnings report.[17]  Lastly, the Plaintiffs argue that the Defendants knowingly made false representations in the SPA.[18]  The Plaintiffs allege that the following disclosures or submissions were false or misleading.

### a. Earnings

The Plaintiffs contend that Wight intentionally manipulated sales data to inflate the apparent value of Click Effects.  In support of this allegation, the Plaintiffs point to particular communications between Wight and his employees.  In a series of emails entitled "Moving Invoices Around" on May 19, 20, and 23, 2016, Wight allegedly instructed certain finance personnel that "we'll need to do some maneuvering with some of the current invoices that are in the books as well as some of the un-invoiced sales orders."[19]  Wight purportedly told members of management that he was "maneuvering" invoices to "smooth earnings" and move April sales from

---

[15] *Id.* ¶ 45.
[16] *Id.* ¶¶ 19–20.
[17] *Id.* ¶ 23.
[18] *Id.* ¶¶ 33–37.
[19] *Id.* ¶ 26.

approximately $117,000 to "somewhere around $700K to 850K [sic]" and to "have May [sales] be close if not over" $1 million.[20]  Wight purportedly caused May invoices to be moved to April and invoiced open sales orders at the end of May instead of when they would ship in June, which the Plaintiffs argue was a deviation from Click Effects' normal practice.[21]  This "earnings bridge" was communicated to Wight's bankers.[22]  According to the Plaintiffs, these emails indicate that Wight intentionally manipulated sales data and submitted false information, resulting in inaccurate projections.[23]

### b. Atlanta Braves and Florida State University

The Plaintiffs next contend that Wight omitted critical information about designated material customers that he was required to disclose under the SPA.  The SPA requires that the Defendants inform the Plaintiffs if a material customer communicates to the Company that, among other things, "it will, or intends to, materially reduce its purchases from or sales or provisions of services to the Company."[24]

---

[20] *Id.*

[21] *Id.* ¶¶ 26–28.  This was purportedly done to maximize the sale price of Click Effects in July 2016.

[22] *Id.* ¶ 29.

[23] *Id.* ¶ 71.

[24] *Id.* Ex. A (SPA) § 2.14 (representations and warranties of the Company regarding certain customers); ¶ 83.

First, the Plaintiffs allege that documents in the data room indicated that Click Effects would receive revenue through several agreements with the Atlanta Braves.[25] However, according to the Plaintiffs, Wight learned from one of his managers, before the sale, that the "Atlanta Braves [were] backing out of the purchase that they made in favor of [a key competitor]."[26] This information, the Plaintiffs argue, triggered a disclosure obligation under the SPA, which was not made. The Plaintiffs allege that Wight knew of this information by June 12, 2016 and communicated it to one of the Company's bankers, but did not inform the Plaintiffs.[27]

Second, the Plaintiffs contend that "on May 21, 2016, Defendant Wight learned that a competitor had beaten out Click Effects for the business of a major customer, Florida State University ('FSU')" but instead "represented to Plaintiffs that the FSU contract was 100% certain" through "projections placed in the data room."[28] The facts concerning FSU were, according to the Plaintiffs, omitted in breach of the SPA.

Third, the Plaintiffs allege that during the pendency of the sale, adverse business conditions became apparent to Wight. They point to an email from a Click Effects manager about "product reliability, lack of meaningful progress on currently

---

[25] *Id.* ¶ 33.
[26] *Id.* ¶ 34.
[27] *Id.* ¶¶ 36–37.
[28] *Id.* ¶ 23.

unusable products . . . and a growing criticism of the way [Click Effects] support[s] [its] customers."[29] This situation, the email states, "will take well over a year to turn IF we immediately address."[30] The Plaintiffs contend that this information should have been disclosed prior to signing the SPA and breached multiple sections of the SPA.[31]

c. The Lease

The Plaintiffs argue that the lease agreement, as disclosed to the buyers, for the property on which Click Effects' corporate headquarters is located, was fraudulent and in breach of representations made in the SPA. Wight leased real estate to Click Effects for its corporate headquarters.[32] The Plaintiffs point to an undisclosed internal email from March 17, 2016, in which Wight stated that the Company "never did an official lease" because "[i]t has always been a handshake between me & me."[33] Nonetheless, Wight submitted a lease signed "as of" January 1, 2016, but in reality created in March 2016.[34] The lease amounted to approximately $1 million over five years.[35] The Plaintiffs contend that the lease was fraudulent and misled the buyers as to the existing lease obligations of Click Effects.

---

[29] *Id.* ¶ 35 (citing a June 12, 2016 email from Click Effects manager Greg Stock to Wight).
[30] *Id.*
[31] *Id.* ¶ 83.
[32] *Id.* ¶ 38.
[33] *Id.* ¶¶ 39–40.
[34] Transmittal Aff. of Daniel T. Menken, Ex. G (Lease), at 1, 10. I find that the lease is incorporated into the Plaintiffs' Complaint.
[35] Compl. ¶ 43.

The Plaintiffs also argue that the lease breached the SPA because it was not a "true, correct and complete" copy of an existing lease.[36]

### 2. The Closing and Indemnification Claims

The Plaintiffs and the Defendants signed the SPA on July 1, 2016.[37] ChyronHego paid Wight and CFX $775,000 in closing cash and $7,528,000 in upfront cash.[38] The Defendants deposited $975,000 into an escrow account.[39] Wight remained president of the newly acquired company.[40]

The Company's performance proved disappointing to the Plaintiffs. For instance, Click Effects produced $500,000 in profits by the end of 2016, contrary to an expected profit of $2–3 million.[41]

The Plaintiffs delivered a written notice (the "Claim Notice") on June 5, 2017 for an indemnification claim against the Defendants for alleged breaches under the SPA.[42] The Defendants responded by letter on June 20, 2017, objecting to the Claim Notice.[43]

---

[36] *Id.* ¶ 42.
[37] *Id.* ¶ 45.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.* ¶ 64.
[42] *Id.* ¶ 66.
[43] *Id.* ¶ 67.

*C. Procedural Posture*

The Plaintiffs filed their first Complaint on July 27, 2017 and an Amended Complaint on November 15, 2017. The Defendants filed this Motion to dismiss the Amended Complaint, and I heard argument on April 18, 2018.

The Plaintiffs bring two counts. Count I alleges that the Defendants committed fraud through misrepresentations in the SPA and via misleading documents submitted to the data room.[44] Count II is an additional or alternative claim for breach of representations and warranties made by the Defendants in the SPA.[45] The Plaintiffs seek damages and equitable relief.[46]

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[47]

---

[44] *Id.* ¶¶ 68–78.
[45] *Id.* ¶¶ 79–94.
[46] *Id.* ¶ 93.
[47] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted).

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[48]

### A. Extra-Contractual Fraud Claims

The Plaintiffs' extra-contractual fraud claims must be dismissed. An element of common-law fraud is that a plaintiff must have acted in justifiable reliance on the misrepresentation of the defendant.[49] I find that Section 4.7 of the SPA functions as an anti-reliance clause and that the Plaintiffs could not have acted in justifiable reliance on any extra-contractual representations or warranties in light of this contractual provision. Because the Plaintiffs cannot show justifiable reliance on extra-contractual representations, the fraud claims that rely on those representations fail.[50]

"Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on other information."[51] This allows parties to "define those representations of fact that formed the reality upon which [they] premised their decision to bargain," which "minimizes the risk of erroneous litigation outcomes by reducing doubts about what was promised and

---

[48] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).
[49] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).
[50] Because I find that the Plaintiffs forewent reliance on extra-contractual representations or warranties, I need not address whether these claims are pled with the particularity required under Rule 9(b).
[51] *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015).

11

said."[52]   However, "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."[53]   As with any contractual analysis, the contract must be read as a whole.[54]   For anti-reliance language to be enforceable, however, "the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[55]

Here, the SPA contains several provisions relevant to a determination of the scope of the parties' agreed-upon sources of reliance: a standard integration clause in Section 9.6,[56] an exclusive remedies provision in Section 7.8,[57] a definition of excluded liabilities in an indemnification provision,[58] and, significantly, the following language in Section 4.7, quoted in full:

---

[52] *Abry Partners V, L.P.*, 891 A.2d at 1058.

[53] *Id.* at 1059.

[54] *See, e.g., Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010).

[55] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004).

[56] Compl. Ex. A (SPA) § 9.6.

[57] *Id.* § 7.8 (Remedies Exclusive) ("No Buyer Indemnified Party or Seller Indemnified Party shall bring any claim with respect to this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, except to bring a claim for (i) Fraud against the party that committed such Fraud, (ii) indemnification against the Sellers in accordance with Section 7.2, (iii) indemnification against a particular Seller in accordance with Section 7.3, or (iv) indemnification against the Buyer in accordance with Section 7.4.").

[58] *Id.* § 7.2 (excluding "any Fraud by the Company or the Sellers (in the case of Company, prior to Closing)" from the definition of indemnifiable liabilities).   Under this provision, "any Fraud" actionable is not subject to the limitations and procedures applicable to indemnification.

12

Holdings and the Buyer agree that neither the Company, any Seller nor any of their respective Affiliates or advisors have made and shall not be deemed to have made any representation, warranty, covenant or agreement, express or implied, with respect to the Company, its business or the transactions contemplated by this Agreement, other than those representations, warranties, covenants and agreements explicitly set forth in this Agreement. Without limiting the generality of the foregoing, the Buyer agrees that no representation or warranty, express or implied, is made with respect to any financial projections or budgets; provided, however, that this Section 4.7 shall not preclude the Buyer Indemnified Parties from asserting claims for Fraud[59] or indemnification in accordance with ARTICLE VII.[60]

Read in conjunction with the integration clause, this is a clear statement that no extra-contractual representations were relied upon by the parties. The first sentence is an explicit anti-reliance clause. The first clause of the second sentence preserves that clause, and emphasizes that no reliance is made on financial projections or budgets. The second clause of the second sentence makes clear that nothing in Section 4.7 precludes claims under Article VII for fraud or indemnification.

Article VII, in turn, provides generally for the availability of, the limits to, and the procedure for, indemnification. Section 7.8 is a specific exclusive remedies provision, and limits recovery to indemnification, damages for fraud, and related equitable relief. To my mind, reading these Sections in harmony, the intent of the parties is clear. The parties have not relied on extra-contractual representations, but

---

[59] "Fraud" is a defined term in the SPA, meaning fraud against a party as defined by common law and determined by a court of competent jurisdiction. The definition specifically includes scienter. *Id.* Art. X.
[60] *Id.* § 4.7.

13

may seek recovery in indemnification and for fraud damages for contractual misrepresentations.

The Plaintiffs argue that the second sentence of Section 4.7 should be read to the contrary, as *preserving* a right to sue for fraud based on extra-contractual projections, rather than *precluding* it.[61] According to the Plaintiffs, "Section 4.7's last clause would be rendered meaningless if a party could not bring fraud claims based on projections."[62] To my mind, this is unpersuasive; the last clause is not mere surplusage. It clarifies the intent to preserve the remedies provided in Article VII. In other words, interpreting Section 4.7 as an anti-reliance provision, the last clause signifies careful lawyering, not surplusage or meaningless verbiage.

In *Prairie Capital*, this Court considered similar anti-reliance language in light of alleged pre-contractual fraud.[63] The parties' stock purchase agreement, as here, contained an integration clause, an "exclusive representations clause,"[64] and an

---

[61] Pls.' Answering Br. 5.

[62] *Id.* at 40–41 (interpreting Section 4.7 to mean "(1) Defendants did not make representations or warranties outside the SPA that can form the basis for a basic breach of contract claim (i.e., one that does not require proof of scienter); but (2) Plaintiffs may bring a Fraud claim against Defendants for knowing misrepresentations or omissions arising from information not subject to a representation or warranty (i.e., projections)").

[63] *Prairie Capital III, L.P.*, 132 A.3d at 43.

[64] *Id.* at 50 ("The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the Double E Companies. In making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE DOUBLE E PARTIES CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER IN CONNECTION WITH THE

14

"exclusive remedies provision."[65]  The plaintiffs argued that these provisions did not affirmatively disclaim reliance, allowing them to sue for fraud based on extra-contractual representations.  They noted that the contract provided for fraud damages as well as indemnification for misrepresentations, and argued that such was inconsistent with an effective anti-reliance clause, because the indemnification sections did "not operate as the sole and exclusive remedy 'in the case of fraud.'"[66]  The *Prairie Capital* Court disagreed, holding that the exclusive remedies section

> recognizes that a party is not limited to the indemnification framework when it sues for fraud, but [the exclusive remedies provision] does not address the representations that a party can rely on in those circumstances. Other provisions in the SPA, such as the Exclusive Representations Clause, perform that function. [The exclusive remedies provision] does not alter the contractual universe of information on which a fraud-claim [sic] can be based.[67]

I find this rationale persuasive here.  The Plaintiffs here are free to sue for fraud, but the anti-reliance language of Section 4.7 dictates what representations may form the basis for such fraud.

---

TRANSACTION, AND THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF DOUBLE E AND THE SUBSIDIARIES) ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES.")

[65] *Id.* at 55 (quoting clause titled "Exclusion of Other Remedies" as saying that "[e]xcept as provided in [sections relating to post-closing covenants and the payment of a specific note], equitable remedies that may be available, or in the case of fraud, the remedies set forth in this Article X [relating to indemnification] constitute the sole and exclusive remedies for recovery of Losses incurred after the Closing arising out of or relating to this Agreement and the Transaction").

[66] *Id.*

[67] *Id.*

I find the Plaintiffs' reliance on *Anvil Holding Corp.*[68] to argue to the contrary misplaced. In that case, the Court was unable to find an enforceable anti-reliance clause from the language pointed to in briefing on a motion to dismiss. The defendants cited additional contractual language, apparently for the first time, at oral argument:

> Section 6.5 contains a lengthy representation and warranty by the Buyer that states, in part, that the Sellers neither made any representation or warranty, express or implied, beyond those expressly given in the Purchase Agreement nor made any representation "as to the accuracy or completeness of any information" regarding the Company or the transactions contemplated by the Purchase Agreement.[69]

However, the *Anvil* Court declined to consider the quoted provision without briefing, and considered it waived for consideration on the motion to dismiss, which was denied.[70] The Court did, however, comment that "[t]his representation, in combination with [the two provisions mentioned], appears to strengthen Defendants' argument that the Buyer could not reasonably have relied on extra-contractual representations."[71] I do not find *Anvil* contrary to my reasoning here.

Finally, I note the Plaintiffs attempt to bootstrap a dog's breakfast of extra-contractual fraud claims onto contractual misrepresentations under Section 2.9(a) of the SPA. That Section represents that:

---

[68] *Anvil Holding Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655 (Del. Ch. May 17, 2013).
[69] *Id.* at *7 n.29.
[70] *Id.*
[71] *Id.*

> Since the date of the Most Recent Balance Sheet . . . , except as set forth on Schedule 2.9 and except for the transactions contemplated by this Agreement, (a) the Company has conducted its business in all material respects in the ordinary course of business consistent with past practice.[72]

Essentially, the Plaintiffs argue that extra-contractual misrepresentations are not in the ordinary course of business. To the extent not addressed below, these claims are dismissed.

### B. Claims for Fraud Under the SPA

The Plaintiffs allege a number of misrepresentations made by the Defendants in the SPA. I examine each in turn, below.[73] I first note that satisfying Rule 9(b)[74] for allegations based on a contract is simplified:

> When a party sues based on a written representation in a contract . . . it is relatively easy to plead a particularized claim of fraud. The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract. Having pointed to the representations, the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false.[75]

---

[72] Compl. Ex. A (SPA) § 2.9(a).

[73] *Abry Partners V, L.P.*, 891 A.2d at 1050 ("To state a claim [for common law fraud], the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.").

[74] Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

[75] *Prairie Capital III, L.P.*, 132 A.3d at 62.

Here, the Plaintiffs must allege facts that make it reasonably conceivable that the representations allegedly given by the Defendants were knowingly false when made.

1. Misrepresentations Regarding Material Customers.

The Defendants disclosed Click Effects' "Material Customers" in the SPA. Both FSU and the Atlanta Braves are so disclosed.[76]

a. The Braves

Section 2.14 of the SPA concerns "material customers" and warrants, in part, that:

> Since the date of the Most Recent Balance Sheet, (a) *no customer has given written notice or, to the knowledge of the Company, otherwise informed* the Company that (i) it will or intends to terminate or not renew its contract with the Company before such contract's scheduled expiration date, (ii) it will otherwise terminate its relationship with the Company (except in connection with the completion of an installation) or (iii) it will, or intends to, materially reduce its purchases from or sales or provisions of services to the Company (except in connection with the completion of an installation).[77]

The Complaint states that "[o]n June 12, 2016, Defendant Wight *learned* from Company management (Greg Stocker) that the 'Atlanta Braves [were] backing out of the purchase that they made in favor of [a key competitor].'"[78]  The Plaintiffs allege that the "Defendants knew by June 12, 2016 that their relationship with the Atlanta Braves was lost" and this development was material.[79]

---

[76] Compl. ¶ 71.
[77] *Id.* Ex. A (SPA) § 2.14 (emphasis added).
[78] *Id.* ¶ 25 (emphasis added).
[79] *Id.* ¶¶ 26, 37.

The Defendants point out that the Complaint does not specify *how* Company management learned about the relationship change with the Atlanta Braves. They note that Section 2.14 of the SPA is triggered by certain communications *from* a material customer *to* the Company, a circumstance not specifically alleged. Assuming, for purposes of this Motion, that Section 2.14 is triggered only when a disclosing party is notified by the customer directly, the question is whether I can draw the inference that the information came from the Atlanta Braves to the Company before the signing of the SPA, rendering the representation in Section 2.14 knowingly false. At this stage, I find, such an inference is reasonable, and the other elements for fraud are met. Whether the Defendants' representation in Section 2.14 regarding the Atlanta Braves was knowingly false when made must be addressed on a more complete record. This claim survives.

### b. The Seminoles

Next, the Complaint alleges that:

> [O]n May 21, 2016, Defendant Wight learned that a competitor had beaten out Click Effects for the business of a major customer, Florida State University ("FSU"). In projections placed in the data room preclosing, Defendants had represented to Plaintiffs that the FSU contract was 100% certain. After Wight learned on May 21, 2016 that FSU was not going to contract with Click Effects, Defendants failed to inform Plaintiffs.[80]

---

[80] *Id.* ¶ 23. As mentioned above, I find that the SPA includes an anti-reliance clause in Section 4.7 that explicitly precludes reliance upon "financial projections or budgets." *Id.* Ex. A (SPA) § 4.7.

As before, the Complaint does not specify *from whom* Wight learned this information. However, at this pleading stage, the question is whether it is reasonably conceivable that the representation made by the Defendants in Section 2.14 was knowingly false as to FSU as of the time of signing the SPA. I may readily infer that such is the case, and was material to the Plaintiffs. I also find it reasonably conceivable that Wight learned this information from FSU. As with the Braves, the specificity requirements of Rule 9(b) are met. The Motion to dismiss this claim must be denied.

### 2. Fraudulent Representations Regarding "Smoothing" of Financial Records

According to the Complaint, the financial disclosures made by the Defendants manipulated or "smoothed" Click Effects' financial records for April and May, 2016, to move revenue back in time in deviation from past accounting practices. The intent was to fraudulently pad April and May financials to mislead the buyers. To the extent that the Complaint implies reliance on the financial statements or projections, separate from contractual representations, the Plaintiffs' attempt to state a claim fails for lack of reasonable reliance, for the reasons detailed above.

The Plaintiffs, however, note that Section 2.9(a) of the SPA warrants that "[s]ince the date of the Most Recent Balance Sheet . . . , except as set forth on Schedule 2.9 and except for the transactions contemplated by this Agreement, (a) the Company has conducted its business in all material respects in the ordinary

20

course of business consistent with past practice."[81]  It is a permissible inference that the "smoothing" made this representation knowingly false, because this practice is purportedly not in the ordinary course of the Company's business, and was materially misleading to the Plaintiffs.  This claim survives.

### 3. Failure to Disclose Company Material Adverse Effects

A contractual material adverse effect ("MAE") is like a Delaware tornado— frequently alleged but rarely shown to exist.  The Plaintiffs allege here that the Defendants failed to disclose that a "change, event, development, effect or circumstance" had occurred during the pendency of the SPA "that would reasonably be expected" to have a material adverse effect, in breach of a condition of closing.[82] According to the Plaintiffs, this failure to disclose was knowingly and materially misleading.  An MAE is triggered by "the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally significant manner."[83]  "A short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquirer."[84]

---

[81] *Id.* § 2.9(a).
[82] *Id.* § 2.9(h) ("[T]o the Company's knowledge, there has been no event or circumstance relating specifically to the Company that has caused a [MAE]."); § 6.1(c) (setting out "No [MAE]" as a closing condition).
[83] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001).
[84] *Id.*

The Plaintiffs allege that "the loss of business from the Atlanta Braves and FSU"; a decline in product reliability and customer service; and the "loss of business, failure to win new business, and dire [financial] forecasts," all occurring in close proximity to the sale, amount to an MAE.[85] The Plaintiffs allege that the financial impact of the purported MAE is "set to last at least two years."[86] To support these allegations, the Plaintiffs point to Click Effects' internal emails, from which the inferences to be drawn are hotly disputed.

At this pleading stage, the Plaintiffs have met their burden to allege a knowingly false representation of the absence of an MAE, the proof of which is inherently fact-intensive. The claim is minimally sufficient, and the Motion to dismiss this claim is denied.

### 4. The Lease

The Plaintiffs seek damages for fraud resulting from the provision by the Company of a lease for its headquarters that was misleadingly backdated to make it appear that it was binding before they contemplated the purchase of Click Effects. Section 2.11 of the SPA states:

> The Company neither owns nor has ever owned any real property. Schedule 2.11 describes the real property leased by the Company, including the lessor of such leased property, which is an Affiliate of certain of the Sellers, and the lease under which such property is leased (the "Lease"). There is no default under the Lease or other circumstance

---

[85] Compl. ¶¶ 83–84; Pls.' Answering Br. 35–36.
[86] Pls.' Answering Br. 36; Compl. ¶ 35 (alleging that MAE impact would be more than one year).

22

that would enable the lessor to cancel or terminate the Lease. The Company does not sublease any leased real property to any Person. The Company has made available to Buyer *true, correct and complete copies* of the Lease.[87]

The Plaintiffs allege that the lease provided was "created . . . out of whole cloth" and was not "true, correct and complete" when made.[88] The Plaintiffs point to the lease itself, which states that "the parties have executed this Lease *as of . . .* this 1st day of January, 2016."[89] The Plaintiffs point to emails from which they infer that the lease was in fact executed no earlier than March 2016, and not in January 2016.[90] Whether the Defendants made a material and knowingly false representation in Section 2.11, upon which the Plaintiffs relied, is a factual question that must be determined on a more complete record.

The Defendants point out that it may be difficult for the Plaintiffs to prove any damages resulting from this misrepresentation, if it occurred. It is sufficient at this stage that the Plaintiffs generally aver damages or entitlement to equitable relief, however. The Motion to dismiss this claim is denied.

*C. CFX and the Fraud Count*

Finally, the Defendants argue that the fraud claim against CFX fails as a matter of law. They point out that the alleged misrepresentations in the SPA were

---

[87] Compl. Ex. A (SPA) § 2.11 (emphasis added).
[88] *Id.* ¶ 42.
[89] Defs.' Mot. to Dismiss Ex. K (Click Effects Lease) (emphasis added). I find that the Plaintiffs incorporated this into the Complaint.
[90] Compl. ¶¶ 39–44.

made by the Company, not by CFX. Indeed, CFX made a separate set of representations and warranties in the SPA,[91] and the Plaintiffs do not premise their fraud claim on any of those statements. Thus, in the Defendants' view, because CFX did not make any of the representations and warranties at issue in this case, it cannot be held liable for fraud. I disagree. In my view, CFX is a proper defendant for the fraud count.

CFX was the selling stockholder in the transaction that transferred ownership of the Company to ChyronHego. Specifically, before the transaction closed on July 1, 2016, Wight transferred his interest in the Company to CFX, which then sold the interest to ChyronHego. Wight was CFX's sole principal. The question, then, is whether CFX, as the selling stockholder, can be held liable for the Company's representations in the SPA.

This Court confronted a similar situation in *Prairie Capital*. There, the stock purchase agreement "distinguished between representations made by the company and a different set of representations made by selling stockholders."[92] The buyer adequately alleged that three of the company's representations in the stock purchase agreement were false.[93] The question was thus whether the sellers could face

[91] *Id.* Ex. A (SPA) Art. III.
[92] *Prairie Capital*, 132 A.3d at 60.
[93] *Id.* at 59.

24

liability for fraudulent representations made by the company.[94] Relying on *Abry Partners*, the Court held that, while "the company made the representations, . . . the scope of a claim for contractual fraud swept more broadly."[95] The Court then quoted the following passage from *Abry Partners*:

> To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State. That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either: 1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty.[96]

In other words, a selling stockholder may face liability for representations made by the company if the stockholder either (i) knew that the company's representations were false or (ii) lied to the buyer about those representations.

Applying these principles, the *Prairie Capital* Court found it reasonably conceivable that the private equity funds that sold the company to the buyer could be held liable for the company's fraudulent contractual representations.[97] In reaching this conclusion, the Court relied on well-pled allegations that the private equity firm's principals knew the company's representations were false.[98] The Court

---

[94] *Id.*
[95] *Id.*
[96] *Id.* at 61 (quoting *Abry Partners V, L.P.*, 891 A.2d at 1064).
[97] *Id.*
[98] *Id.*

also pointed to allegations that the private-equity principals actively participated in the fraudulent scheme by directing company officers to provide falsified sales numbers to the buyer.[99]

Here, the SPA distinguishes between representations made by the Company and representations made by the sellers, including CFX. Thus, under *Prairie Capital*, CFX can be held liable for the Company's contractual representations only if it either knew those representations were false or lied to the buyers about the representations. CFX's sole principal was Wight, so his knowledge may be imputed to CFX.[100] According to the Complaint, Wight orchestrated the fraudulent scheme that led to the alleged misrepresentations in the SPA. At the very least, then, Wight knew that the Company's contractual representations were false. Because that knowledge may be imputed to CFX, CFX also knew that the representations were false. Accordingly, CFX can be held responsible for the Company's fraudulent contractual representations. That is sufficient under *Prairie Capital* to keep CFX as a Defendant for the fraud count at this stage of the litigation.

---

[99] *Id.*

[100] *See, e.g.*, *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1262 (Del. Ch. 2015) ("For multitudinous purposes the knowledge and actions of a corporation's human decision-makers and agents may be imputed to it.").

26

*D. Indemnification Claims*

## 1. The Claim Notice

The pleadings involving fraudulent misrepresentations generally also state breaches of the SPA sufficient to survive a motion to dismiss. The Defendants point out, however, that the SPA limits such claims to an indemnification procedure, which they argue the Plaintiffs did not meet.

Section 7.5 of the SPA requires that a party making a claim for indemnification undertake certain actions, including delivery of "a written notice describing the claim in *reasonable specificity*, the amount thereof (if known), and the basis therefor (a 'Claim Notice')."[101] The Plaintiffs gave the Defendants explicit notice regarding alleged breaches of Sections 2.9 and 2.14 of the SPA and discussed certain facts underlying other claims.[102] I assume for purposes of this Motion that the requirements of Section 7.5 of the SPA are mandatory, and that failure to comply precludes a successful action for indemnification. Nonetheless, the Motion to Dismiss based on failure of a sufficient Claim Notice must be denied.

"Reasonable specificity" depends on the circumstances and the allegations; in other words, it involves questions of fact.[103] I note that, despite their argument here

---

[101] Compl. Ex. A (SPA) § 7.5(a) (emphasis added).

[102] *See* Defs.' Opening Br. Exs. E–F (including Claim Notice and subsequent correspondence). I find that the Claim Notice and correspondence is incorporated by the Plaintiffs into their Complaint.

[103] *Impact Invs. Colorado II, LLC v. Impact Holding, Inc.*, 2012 WL 3792993, at *8 (Del. Ch. Aug. 31, 2012) ("In that regard, the parties raise two questions that the Court cannot resolve on summary

that the Claim Notice was insufficient, the Defendants responded to it in some detail, implying that the Notice was specific to at least some aspects of the Plaintiffs' claims.[104] Questions of the required scope and resulting sufficiency of the Plaintiffs' Claim Notice are mixed questions of fact and law, and await a developed record. The Motion to dismiss the indemnification claim based on insufficiency of notice is denied.

### 2. GAAP Compliance

The Plaintiffs also raise an indemnification claim that does not mirror one of their fraud claims. They allege that the Defendants made misrepresentations about GAAP compliance for the statements submitted by the Defendants to aid the Plaintiffs' preparation of the quality of earnings statement in March 2016, as it pertains to (a) revenue recognition, (b) EBITDA, and (c) working capital.[105]

Section 2.8 of the SPA states that the Company provided the buyers with balance sheets from December 31, 2014, December 31, 2015, and March 31, 2016, as well as other financial statements from that time.[106] Section 2.8 warrants that the submitted statements were prepared in accordance with GAAP as "consistently applied . . . except as otherwise stated therein" and except for other exceptions set

---

judgment. The first is the legal question as to the proper meaning of 'with reasonable particularity.' The second is the factual question of whether Buyer's Claim Notice satisfied the 'reasonable particularity' requirement.").

[104] Defs.' Opening Br. Ex. G (Objection to Claim Notice Dated June 5, 2017).

[105] Compl. ¶¶ 31–32; Pls.' Answering Br. 48–50.

[106] Compl. Ex. A (SPA) § 2.8(a).

out in a schedule.[107]  The Plaintiffs argue that the statements from December 2014 through March 2016 were not prepared in accordance with GAAP as "consistently applied."  The Defendants seek to dismiss for failure to state a claim.  They argue strenuously that deviations from GAAP in the statements are adequately disclosed.  This raises factual issues that await a developed record, and this claim survives pending such record.[108]

### 3. CFX

CFX and the other sellers agreed to "jointly & severally" indemnify buyers[109] against any claims made pursuant to Article VII.[110]  Consequently, CFX is properly included as a Defendant in the indemnification claims.

---

[107] *Id.* § 2.8(a).

[108] The Plaintiffs appear to argue that the "smoothing" of earnings from April–June of 2016, discussed in Section II(B)(2) of this Memorandum Opinion, renders fraudulent Defendants' representation, in Section 2.8(a) of the SPA, that the Company had not provided false information *in connection with the buyer's quality of earnings report*.  They point to the same "smoothing" with respect to this indemnification claim.  They argue that the subsequent "smoothing" renders, or is evidence that, the documents referenced were not GAAP compliant as "consistently applied."  The documents in question in both of these assertions, and the quality of earnings report itself, cover a period ending in March 2016, before any "smoothing."  These specific claims, therefore, are fatally anachronistic, and (to the extent Plaintiffs attempt to assert them) are dismissed.  *But see, e.g.*, Stephen Hawking, *A Brief History of Time* (1998).

[109] At oral argument, the Defendants asked that I dismiss the Vector entities as party plaintiffs.  Because this issue was not briefed, I do not address it here, other than to note that this decision is without prejudice to any argument that these entities are not proper parties to this litigation.

[110] Compl. Ex. A (SPA) § 7.2 ("From and after the Closing, the Sellers shall jointly and severally indemnify and hold the Buyer, Holdings, the Company and their directors, officers, members, partners, employees and Affiliates (the 'Buyer Indemnified Parties') harmless from and against all Losses which the Buyer Indemnified Parties may suffer, sustain, incur, accrue or become subject to . . . [the grounds for indemnification].").

## III. CONCLUSION

The Motion to Dismiss is granted to the extent described herein.  Otherwise, the Motion to Dismiss is denied. The parties should provide an appropriate form of order.