**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

Submitted: July 11, 2024
Decided: August 29, 2024

Jeffrey L. Moyer, Esquire
Travis S. Hunter, Esquire
One Rodney Square
920 N. King Street
Wilmington, DE 19801

Michael A. Barlow, Esquire
Hayden J. Driscoll, Esquire
500 Delaware Avenue, Suite 220
Wilmington, DE 19801

Re:   **DDS Striker Holdings, LLC, et al. v. Verisk Analytics, Inc., et al.**
      **C.A. No. N24C-02-130 VLM CCLD**

Dear Counsel:

This is the Court's decision on Defendants Verisk Analytics, Inc. and Insurance Service Office, Inc.'s Motion to Dismiss Counts II through V of the Complaint under Superior Court Civil Rule 12(b)(6) and to Strike the Jury Demand under Rule 12(f).   For the reasons stated below, Defendants' Motion to Dismiss is **GRANTED** as to Count II, and **DENIED** as to Counts III through V.   Defendants' Motion to Strike is **GRANTED**.

## *Relevant Facts & Procedural History*[1]

Plaintiffs DDS Striker Holdings, LLC and Data Driven Holdings, Inc. sold their interests in Data Driven Security, LLC ("DDS") to Defendants through a Securities Purchase Agreement dated August 24, 2021 (the "Agreement").[2]   That transaction closed on November 2, 2021.[3]   As relevant to this litigation, the purchase price consisted of a $93 million base payment and a contingent earnout

---

[1]   The following facts are derived from Plaintiff's Complaint, D.I. No. 1 (hereinafter, "Compl."), and are presumed to be true solely for purposes of this motion.
[2]   Compl. ¶ 1.
[3]   *Id.*

payment that, if achieved, would be worth between $7 million and $40 million.[4] The contingent payment was not achieved, leading to this controversy.

Throughout the parties' negotiations, Plaintiffs consistently demanded a purchase price of at least $100 million.[5] Defendants pressed for an earnout structure, explaining that it would allow Defendants to "stretch" the purchase price permitted under Defendants' internal underwriting model.[6] Plaintiffs instead demanded an earnout structure in which a payment would be "an absolute certainty" as long as DDS did not lose customers.[7] Defendants, in turn, sought to convince Plaintiffs of "the certainty" that Plaintiffs would receive a contingent payment.[8]

As pertinent here, Defendants highlighted additional revenue that could be generated by "Synergy Products"—*i.e.*, new products and features made possible by combining Defendants' resources with DDS's data.[9] That opportunity for revenue growth was important to Plaintiffs because the earnout payment depended on DDS achieving certain post-closing revenue targets.[10] Defendants spent months trying to assure Plaintiffs that a contingent earnout payment was "tantamount to money in the bank."[11]

Eventually, after drawn-out negotiations, individuals representing Defendants represented they were "operationally and personally invested in hyper-charging [DDS]'s growth initiatives," and Plaintiffs signed a letter of intent in May 2021 that called for an earnout structure.[12] But Plaintiffs wanted protection.

As one form of protection, Plaintiffs negotiated for an asymmetrical integration clause that excluded Plaintiffs' pre-contractual representations from the Agreement but allowed the representations Defendants made during negotiations to survive closing.[13] As another form of protection, Plaintiffs obtained several express contractual obligations limiting Defendants' discretion to operate DDS during the

---

[4]  *Id.* ¶ 2.
[5]  *Id.* ¶ 75.
[6]  *Id.* ¶ 41.
[7]  *Id.* ¶ 42.
[8]  *Id.*
[9]  *Id.* ¶¶ 49-50.
[10]  *Id.* ¶ 46.
[11]  *Id.* ¶ 55.
[12]  *Id.* ¶ 84.
[13]  *Id.* ¶ 85.

earnout period.[14]   Those provisions included covenants that Defendants would: (1) "operate the business of [DDS] in good faith and in a manner intended to facilitate and reasonably support the continued success thereof"; (2) "use reasonable best efforts to operate the business in a manner consistent with the Estimated Budget"; (3) "not . . . take any action (or fail to take any action) . . . intentionally designed to prevent, limit, delay, encumber or reduce the ability of [DDS] to achieve Adjusted Revenue Targets"; and (4) retain DDS's Chief Executive Officer and give him "management authority with respect to [DDS]."[15]

Pursuant to the Agreement, the one-year earnout period ran from June 2022 to June 2023.[16]   The earnout structure established escalating revenue targets for the earnout period.[17]   The minimum earnout payment of $7 million—which Plaintiffs thought was essentially guaranteed—would be triggered if DDS's revenue exceeded $12.5 million.[18]   From there, the earnout payments escalated up to a $40 million payment if DDS achieved revenue greater than $18 million.[19]   If DDS earned less than $12.5 million in revenue during the earnout period, though, Plaintiffs would receive no earnout payment.[20]

Ultimately, DDS's revenue during the earnout period was only $10.3 million, which did not trigger any contingent earnout payment.[21]   Plaintiffs blame that unsatisfactory result on a wide variety of Defendants' post-closing conduct that allegedly breached the terms of the Agreement.[22]   Defendants have not moved to dismiss Plaintiffs' breach-of-contract claim at this point, so the Court need not recite the Complaint's detailed allegations in that respect.

The allegations most applicable to this decision pertain to the Synergy Products.   Specifically, Plaintiffs allege that Defendants did not commercialize any of the contemplated Synergy Products during the earnout period, even though the Synergy Products were supposed to drive DDS's earnout-producing revenue

---

[14]   *Id.* ¶ 86-87.
[15]   *Id.* ¶ 87.
[16]   *Id.* ¶ 89.
[17]   *Id.* ¶ 90.
[18]   *Id.*
[19]   *Id.*
[20]   *Id.*
[21]   *Id.* ¶ 91.
[22]   *Id.* ¶¶ 97-304.

growth.[23]   Critically, Plaintiffs claim Defendants knew throughout the negotiations that maximizing the earnout payment through the Synergy Products "was a practical impossibility."[24]   Accordingly, in addition to claiming that Defendants breached covenants contained in the Agreement, Plaintiffs accuse Defendants of using fraud to induce Plaintiffs' assent to it.

Based on those allegations, Plaintiffs filed their Complaint on February 12, 2024.[25]   They assert five causes of action: breach of contract (Count I);[26] breach of the implied covenant of good faith and fair dealing (Count II);[27] fraud in the inducement (Count III);[28] common-law fraud (Count IV);[29] and civil conspiracy (Count V).[30]   Plaintiffs request rescissory damages, compensatory damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and any other relief to which they may be entitled.[31]

On April 3, 2024, Defendants filed a motion arguing that Plaintiffs' allegations only conceivably support a breach-of-contract claim and asserting that Plaintiffs' demand for a jury trial is disallowed under the Agreement.[32]   Plaintiffs filed their opposition on May 24, 2024.[33]   Defendants replied on June 21, 2024.[34] The Court heard oral argument on July 11, 2024.[35]   The matter is ripe for decision.

### *Standard of Review*

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), all well-pleaded allegations in the complaint must be accepted as true.[36]   Even vague allegations are considered well pled if they give the opposing party notice of a

---

[23]   *Id.* ¶ 170.
[24]   *Id.* ¶ 172.
[25]   *See* Compl.
[26]   *Id.* ¶¶ 312-22.
[27]   *Id.* ¶¶ 323-27.
[28]   *Id.* ¶¶ 328-35.
[29]   *Id.* ¶¶ 336-43.
[30]   *Id.* ¶¶ 344-50.
[31]   *Id.* at Prayer for Relief.
[32]   *See* D.I. No. 6 (hereinafter, "Mot.").
[33]   *See* D.I. No. 14 (hereinafter, "Opp'n").
[34]   *See* D.I. No. 15 (hereinafter, "Reply").
[35]   *See* D.I. No. 22.
[36]   *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

claim.[37]   The Court must draw all reasonable inferences in favor of the non-moving party.[38]   However, the Court will not "accept conclusory allegations unsupported by specific facts," nor "draw unreasonable inferences in favor of the non-moving party."[39]   The Court will grant a motion to dismiss "only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle [the plaintiff] to relief."[40]

Rule 12(f) permits the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." [41]   On motion under Rule 12(f), the Court examines "whether the challenged allegation is relevant to an issue in the case, and if it is unduly prejudicial."[42]   "Motions to strike 'are granted sparingly, and then only if clearly warranted, with doubt being resolved in favor of the pleading.'"[43]

## *Discussion*

### 1. *Plaintiffs' Fraud Allegations, which Support Plaintiffs' Civil Conspiracy Claim, are Reasonably Conceivable.*

The elements of common-law fraud and[44] fraudulent inducement are:

(1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.[45]

---

[37]   *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. F.M.R. Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).
[38]   *Id.*
[39]   *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citation omitted).
[40]   *Sliney v. New Castle Cty.*, 2019 WL 7163356, at *1 (Del. Super. Dec. 23, 2019).
[41]   Super. Ct. Civ. R. 12(f).
[42]   *Heisenberg Principals Fund IV, LLC v. Bellrock Intel., Inc.*, 2018 WL 3460433, at *1 (Del. Super. July 17, 2018) (ORDER) (citations omitted).
[43]   *Id.* (quoting *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 661 (Del. Super. 1985)).
[44]   *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020) ("The elements of fraud and fraudulent inducement are the same.").
[45]   *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) (citing *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015).

Superior Court Civil Rule 9(b) heightens the pleading standard for fraud claims.[46]   Pursuant to that Rule, a plaintiff must plead the "time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the representation; and what that person(s) gained from making the misrepresentation" with particularity.[47]   Under Rule 9(b), though, "knowledge and other condition of mind of a person may be averred generally."[48]

The Court takes guidance from the recent decision in *Pearce v. NeueHealth, Inc.*[49]   There, the plaintiff pled a fraud claim that was largely based upon seemingly inactionable "imprecise statements and predictions."[50]   That Court explained, however, that "[t]he Court is not tasked with tailoring Plaintiffs' pleading to include only actionable statements."[51]   Instead, "[its] role at the pleading stage is only to determine whether the plaintiff has brought a reasonably conceivable claim of fraud."[52]   Because the *Pearce* court found at least one conceivably actionable misrepresentation, the plaintiffs' entire fraud claim survived under Rule 12(b)(6).[53]   The analysis is similar here.

Plaintiffs' ninety-one-page Complaint alleges a wide array of supposed misrepresentations.   Most of them appear, at this stage, to be inactionable puffery, predictions, or promises.   Nevertheless, at least one alleged misrepresentation could conceivably support Plaintiffs' fraud claims.   This suffices "at this 'plaintiff-friendly' juncture in the litigation."[54]

The alleged misrepresentation that could support fraud liability pertains to the "Jornaya Product."   The Jornaya Product was meant to be a new Synergy Product made possible by combining DDS-owned data with data owned by Defendants' subsidiary, Jornaya.[55]   The parties estimated that the Jornaya Product would

---

[46]   *Id.*
[47]   *Id.* (citations omitted).
[48]   *Id.* (quoting Super. Ct. Civ. R. 9(b)).
[49]   2024 WL 3421900 (Del. Super. July 15, 2024).
[50]   *Id.* at *7.
[51]   *Id.* at *6 (collecting authority).
[52]   *Id.*
[53]   *Id.* at *7-8.
[54]   *Id.* at *7 (quoting *CRE Niagara Hldgs., LLC v. Resorts Grp., Inc.*, 2021 WL 1292792, at *9 (Del. Super. Apr. 7, 2021)).
[55]   Compl. ¶ 213.

generate more than $2 million in annual revenue during the earnout period.[56] During negotiations, Defendants represented to Plaintiffs that Jornaya's data "contained the necessary characteristics to be linked to the DDS data."[57] That representation was important because data compatibility was "a precursor to any viable Jornaya Product."[58]

Contrary to Defendants' alleged representations, Jornaya and DDS's "data sets were incompatible."[59] According to Plaintiffs, even "a cursory glance at Jornaya['s] data schema or a momentary review of the actual data" would have revealed the incompatibility to Defendants.[60] Moreover, Plaintiffs allege that Defendants concealed the truth by not responding to Plaintiffs' requests to review this Jornaya data.[61] In the end, the contemplated Jornaya Product generated no revenue during the earnout period, which contributed to the earnout-defeating revenue shortfall.[62] Taken together, those allegations raise a reasonable inference that Defendants knowingly made a false statement of fact about Jornaya's data with intent to induce Plaintiffs into entering the Agreement, and Plaintiffs relied on the same to their detriment. This is sufficient to support a fraud claim.[63]

Defendants' maintain that "[t]he Jornaya representations are quintessential puffery."[64] They emphasize that the Complaint uses terms like "boasted" and "touted" in describing the Jornaya representations.[65] The term "puffery" "refers to 'a vague statement boosting the appeal of a service or product that, because of its vagueness and unreliability, is immunized from regulation.'"[66] There is nothing vague or inherently unreliable about the representation that two data sets are

---

[56] *Id.* ¶ 214.

[57] *Id.* ¶ 215.

[58] *Id.*

[59] *Id.* ¶ 216.

[60] *Id.* ¶ 217.

[61] *Id.* ¶ 218.

[62] *Id.* ¶ 221. The parties estimated the Jornaya Product could generate over $2 million in annual revenue during the earnout period, and the ultimate revenue shortfall for the minimum earnout payment was about $2.2 million. *Id.* ¶¶ 92, 214.

[63] *See Valley Joist BD Hldgs.*, 269 A.3d at 988.

[64] Reply at 18.

[65] *Id.* at 18-19.

[66] *Trifecta Multimedia Hldgs., Inc. v. WGS Clinical Servs. LLC*, ___ A.3d ___, ___, 2024 WL 2890980, at *9 (Del. Ch. June 10, 2024) (internal quotation marks omitted) (quoting David A. Hoffman, *The Best Puffery Article Ever*, 91 Iowa L. Rev. 101, 103 (2006)).

compatible. Nor does the Complaint's use of the terms "boasted" and "touted" make this representation mere puffery. Conveying a false statement of specific, empirical fact is actionable no matter whether the speaker said it boastingly or stoically. Additional facts could alter this analysis at later stages of the litigation but giving Plaintiffs' the benefit of all reasonable inferences now, Plaintiffs state viable fraud claims.

Having decided that Plaintiffs' fraud claims "clear the low threshold of Rule 12(b)(6),"[67] Delaware's anti-bootstrapping doctrine and the accompanying rules are no impediment here.[68] That is because—aside from the basic contours of the transaction—Plaintiffs' tort and contract claims arise from distinct allegations.[69] The fraud claims pertain to whether Defendants made false statements during negotiations with the intent to induce Plaintiffs into the Agreement.[70] The breach-of-contract claim pertains to whether Defendants complied with their contractual obligations to operate DDS in good faith post-closing and to not interfere with achievement of the earnout.[71] Those claims are not redundant. It is conceivable that Defendants made false statements to entice Plaintiffs to sign the Agreement but then acted appropriately during the earnout period. It is also conceivable that Defendants were honest during negotiations but then were lured into a breach by the prospect of not paying the earnout. Either of these mutually exclusive scenarios could entitle Plaintiffs to relief.

Plaintiffs are not bound to pursue only one of those factually dissimilar but equally viable theories simply because the calculation of potential damages under

---

[67] *See Pearce*, 2024 WL 3421900, at *8.

[68] *See Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *7-9 (Del. Ch. Jan. 27, 2022) (detailing Delaware's anti-bootstrapping rules and explaining "duplicative" damages raise "a pleading stage inference of bootstrapping").

[69] *Id.* at *7 ("To be sure, a plaintiff can avoid the anti-bootstrapping rule by pleading facts in support of a fraud claim that have nothing to do with the facts pled in support of a separately alleged breach of contract. That proposition . . . is self-evident."). As alluded to above, some of Plaintiffs' fraud allegations overlap with breach-related allegations such that the anti-bootstrapping rule may be implicated with respect to those claims. For now, though, the Court construes the Complaint in the light most favorable to Plaintiff, which means focusing on Plaintiffs' most viable allegations. The Jornaya representations, for instance, "have nothing to do with" Defendants' post-closing operation of DDS. *See id.*

[70] Compl. ¶¶ 328-43.

[71] *Id.* ¶¶ 312-22.

both are based upon similar numbers in the Agreement.[72]   To do so would, in effect, deprive Plaintiffs of a remedy and allow Defendants to use a fraudulently obtained contract to immunize themselves from fraud liability, which runs directly counter to core Delaware precedent.[73]   Of course, if Plaintiffs can prove Defendants committed both wrongs, the Court will not allow Plaintiffs to reap a windfall.[74]   For those reasons, Counts III (fraudulent inducement) and IV (common-law fraud) withstand this Motion.

As Defendants recognized, "Plaintiffs' civil conspiracy claim rises and falls with their fraud claims[.]"[75]   Since Plaintiffs' fraud claims do not fall on this Motion, neither does the civil conspiracy claim contained in Count V.

### 2. Plaintiffs' Implied-Covenant Claim is Legally Deficient.

"The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[76]   Importantly here, "a party summoning the implied covenant must reveal a 'gap' in the subject agreement."[77]   Stated another way, "if the contract at issue expressly addresses a

---

[72]   *See Yangaroo Inc. v. Digit. Media Servs., Inc.*, 2024 WL 2791100, at *10 (Del. Super. May 30, 2024) ("The minimum award listed in each prayer for relief is uncoincidentally the purchase price under the APA.   [Plaintiff] may not recover the same damages multiple times but, at the pleading stage, it need not pick just one theory to pursue when the allegations support several." (citations omitted)).

[73]   *See ABRY Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1060-64 (Del. Ch. 2006) ("To the extent that [a contract] purports to limit [a contracting party's] exposure for its own conscious participation in the communication of lies to the [other contracting party], it is invalid under the public policy of this State.").   If the Court were to dismiss Plaintiffs' fraud claims at the pleading stage in favor of the parallel breach-of-contract claim, but the facts proven later in the case only support pre-contractual fraud, then the Agreement's efforts provisions would effectively function as an unintended waiver of fraud liability.

[74]   *Yangaroo*, 2024 WL 2791100, at *10; *see also CoVenture – Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488, at *10 (Del. Super. Nov. 1, 2023) ("Should [plaintiff] be successful in its fraud in the inducement claim, it is not entitled to double recovery, assuming full recovery for breach of contract.").

[75]   Mot. at 21.   Defendants' lone defense against the civil conspiracy claim was the purported lack of a predicate wrongful act.   *Id.*

[76]   *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[77]   *Mikkilineni v. PayPal, Inc.*, 2021 WL 2763903, at *10 (Del. Super. July 1, 2021).

particular matter, an implied covenant claim respecting that matter is duplicative and not viable."[78]

The violation of the implied covenant that Plaintiffs allege in their Complaint is that "Defendants exercised the discretion [to control DDS during the earnout period] afforded to them under the Purchase Agreement intentionally and in bad faith to deprive Plaintiffs the benefit of their bargain."[79]  Typically, "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[80]  In this case, however, Plaintiffs' Complaint reveals that the implied covenant plays no role here.  Immediately after the above-quoted explanation of Defendants' alleged breach of the implied covenant, Plaintiffs continue, "[i]ndeed, as set forth in detail above, Defendants disregarded entirely the seller protective covenants negotiated into the Purchase Agreement to deprive Plaintiffs from the bargain that had been struck."[81]

Breaching contractual provisions that require the exercise of good faith is not a breach of any implied covenant but rather a breach of the express covenants. Here, the Agreement expressly contemplates and governs Defendants' obligations with respect to controlling DDS during the earnout period.[82]  Accordingly, there is no gap to fill with an implied term.  At best, the term Plaintiffs ask the Court to imply is coextensive with the Agreement's express terms, in which case this claim is simply duplicative.[83]  Otherwise, Plaintiffs ask the Court to give Plaintiffs a better deal than they bargained for, which is something this Court will not do.[84]  Thus, Count II must be dismissed.

---

[78] *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (citations omitted).

[79] Compl. ¶ 326.

[80] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146-47 (Del. Ch. 2009) (collecting authority).

[81] Compl. ¶ 326.

[82] *See id.* ¶ 87.

[83] *Edinburgh Hldgs.*, 2018 WL 2727542, at *9.

[84] *See, e.g.*, *Dow Chem. Co. v. CITIC Agri Invs. Co., Ltd.*, 2024 WL 23765, at *5 (Del. Super. Jan. 2, 2024) ("A party may not use the implied covenant of good faith and fair dealing to re-write a contract's terms." (collecting authority)).

### 3. *Plaintiffs' Jury Demand is Precluded by the Agreement.*

The final issue raised in Defendants' motion is whether Plaintiffs' demand for a jury trial must be stricken. In Section 12.7 of the Agreement, each party broadly waived its right to a jury trial with respect to disputes related to the Agreement. Plaintiffs do not contend that the language of Section 12.7 permits their jury demand. Nor do Plaintiffs raise any fact-specific reason why Section 12.7 should not be enforced here. Instead, with scant supporting authority, Plaintiffs propose two categorical rules: (1) jury waiver provisions cannot be enforced until discovery is complete; and (2) jury waiver provisions cannot be enforced when a plaintiff claims fraud. The Court declines to adopt either rule.

Preliminarily, *Pearce* is again instructive. There, the court enforced a jury waiver provision at the pleading stage of a case alleging fraud.[85] Although that could end this inquiry, in the interest of completeness, the Court briefly addresses Plaintiffs' two arguments.

Plaintiffs cite *Wilmington Trust Co. v. Renner's Paving, LLC*[86] for the proposition that enforcing a jury waiver at the pleading stage is "premature."[87] Plaintiffs derive that proposition from one sentence of *Wilmington Trust* in which that Court stated that—after the movant presents the relevant contract language that conspicuously waives the right to a jury—the non-movant "must then produce record evidence that demonstrates that there are countervailing circumstance that make enforcement of such a waiver inappropriate."[88] To Plaintiffs, the use of the term "record evidence" means jury waivers cannot be enforced until after discovery is taken.[89]

*Wilmington Trust* did not establish this proposed interpretation. There, the motion to strike was lodged just weeks before the scheduled trial date and after discovery occurred.[90] In that procedural context, it is natural to require record evidence instead of mere allegations. But that Court said nothing about pleading-stage requirements or where in litigation stages the Court must consider the enforceability of jury waiver provisions. Instead, *Wilmington Trust's* analysis

---

[85] *Pearce*, 2024 WL 3421900, at *11.
[86] 2013 WL 1442366, at *5 (Del. Super. Mar. 27, 2013).
[87] Opp'n at 31.
[88] 2013 WL 1442366, at *5.
[89] Opp'n at 31.
[90] *Wilm. Tr. Co.*¸ 2013 WL 1442366, at *2-3.

focused on the non-movant's burden of proving a conspicuous jury waiver as unenforceable.[91]   Moreover, in the wake of *Wilmington Trust*, this Court has not hesitated to substantively consider motions to strike jury demands at the pleading stage and to grant them when there are no factual disputes.[92]

Plaintiffs' next argument—that fraud allegations alone defeat an otherwise valid jury waiver provision—is not supported by any authority.   Plaintiffs only say, "Delaware abhors fraud, so it would be inequitable to enforce a provision of an agreement procured by fraud."[93]   This argument puts the cart before the horse. Defendants' fraudulent conduct must be proven by Plaintiffs to the fact finder(s). So, Plaintiffs ask the Court to put aside the undisputed fact that Plaintiffs agreed to litigate issues related to the Agreement without a jury and replace it with the fiercely disputed fact that Defendants obtained the Agreement through fraud.   In essence, Plaintiffs want this Court to award them a portion of their remedy for fraud before they prove any fraud occurred.   The Court will not deprive Defendants of the jury waiver provision they bargained for based only on unproven allegations unrelated to the jury waiver itself.[94]   Thus, the Court will grant Defendants' motion to strike Plaintiffs' jury demand.

### *Conclusion*

Plaintiffs allege facts that, if true, would satisfy the elements of fraud. Relatedly, Plaintiffs' claim of a civil conspiracy is reasonably conceivable. Plaintiffs' claim of a breach of the implied covenant of good faith and fair dealing, in contrast, is deficient as a matter of law.   Accordingly, Defendants' Motion to

---

[91]   *Id.* at *3-5.

[92]   *See, e.g.*, *The Data Center, LLC v. 1743 Hldgs. LLC*, 2015 WL 6662107, at *4-7 (Del. Super. Oct. 27, 2015) (granting motion to strike jury request at pleading stage); *Appliance Recycling Ctrs. of Am., Inc. v. Recleim LLC*, 2021 WL 1174692, at *6 (Del. Super. Mar. 29, 2021) (same); *PVP Aston, LLC v. Fin. Structures Ltd.*, 2022 WL 1772247, at *9 (Del. Super. May 31, 2022) (finding contractual jury waivers ambiguous and denying motion to strike without prejudice to permit discovery).

[93]   Opp'n at 31.

[94]   *Cf. Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Grp. (Hldg.)*, 2012 WL 4847089, at *10 (Del. Ch. Oct. 11, 2012) ("Under Delaware and federal law, a party cannot escape a valid forum selection clause, or its analogue, an arbitration clause, by arguing that the *underlying contract* was fraudulently induced or invalid for some reason unrelated to the forum selection or arbitration clause itself. Instead, the party must show that the forum selection clause *itself* is invalid." (emphasis in original) (collecting authority)).

Dismiss is **GRANTED** as to Count II, but **DENIED** as to Counts III through V. Plaintiffs do not raise any factual dispute as to the enforceability or applicability of the Agreement's jury waiver provision.   Accordingly, Defendants' Motion to Strike the Jury Demand is **GRANTED**.

Sincerely,

/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge